# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    --------------------------------X

4    STRAIGHT PATH IP GROUP, INC.      )

5              Plaintiff,              ) No. C 16-03463 WHA

6       v.                             ) No. C 16-03582 WHA

7    CISCO SYSTEMS, INC.,              )

8              Defendant.              )
     _____
9
     STRAIGHT PATH IP GROUP, INC.      )
10
               Plaintiff,              )
11
        v.                             )
12
     APPLE, INC.,                      )
13
               Defendant.              )
14
     --------------------------------X
15

16

17   VIDEOTAPED DEPOSITION OF HONORABLE PAUL R. MICHEL

18                  Washington, D.C.

19              Thursday, August 29, 2019

20

21

22
     Pages:  1 - 185
23
     Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,
24   CRR, CLR, RSA, LiveDeposition Authorized Reporter

25   Job Number:  281787

Page 6

```
 1                    -  -  -
 2             E X H I B I T S
 3               (Continued)
 4                    -  -  -
 5    DEPOSITION
      EXHIBIT NUMBER   DESCRIPTION              PAGE NO.
 6
 7       11     Order, Diamondback v. Repeat
 8              Precision, et al.          88
 9
         12     Case cite, Highmark v. Allcare
10
                Health Management System    91
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1          P R O C E E D I N G S
 2             * * * * * * * * *
 3              Washington, D.C.
 4           August 29, 2019; 9:59 a.m.
 5
 6           THE VIDEOGRAPHER:  This is the
 7    video deposition of Paul Michel in the
 8    matter of Straight Path IP Group,
 9    Incorporated versus Cisco Systems,
10    Incorporated and Straight Path IP
11    Group, Incorporated versus Apple
12    Incorporated.
13           This deposition is being held at
14    the office of Hogan Lovells on
15    August 29th, 2019.
16           My name is Jason Levin,
17    from U.S. Legal Support, and I'm the
18    video specialist.
19           The court reporter today is
20    Cindy Sebo, also in association with
21    U.S. Legal Support.
22           We are going on the record at
23    9:59 a.m.
24           All counsel will appear on the
25    stenographic record.
```

Page 8

```
 1           Will the court reporter please
 2    swear in the witness?
 3                    -  -  -
 4           HONORABLE PAUL R. MICHEL,
 5    after having been first duly sworn, was
 6      examined and testified as follows:
 7                    -  -  -
 8                    -  -  -
 9    EXAMINATION BY COUNSEL FOR DEFENDANT
10             CISCO SYSTEMS, INC.
11                    -  -  -
12    BY MR. DESMARAIS:
13      Q.   Good morning, Judge Michel.  Nice to
14    see you again.
15           Now, you retired from the Federal
16    Circuit at the end of May in 2010; is that right?
17      A.   Correct.
18      Q.   And since retiring from the Bench,
19    am I right that from time to time, you help
20    parties involved in patent litigation by giving
21    them legal advice or other assistance?
22      A.   Yes, among other consulting duties.
23      Q.   And in this case, as I understand
24    it, you were hired by Straight Path to help them
25    prepare for the appeal of this case; is that
```

Page 9

```
 1    right?
 2      A.   For the oral argument.  I was not
 3    involved in the briefing stage, but I was retained
 4    shortly before the oral argument to help prepare
 5    Mr. Fenster for that particular stage of the
 6    appeal.
 7      Q.   And that appeal was from
 8    Judge Alsup's summary judgment decision; is that
 9    right?
10      A.   Yes.
11      Q.   And to cover a little background
12    about you before we get into the -- your work on
13    the case.
14           Am I right that your judiciary
15    career was always on the Court of Appeals for the
16    Federal Circuit?
17      A.   Yes.
18      Q.   You never sat on the District Court
19    as a District Court judge, right?
20      A.   No, I --
21      Q.   And --
22      A.   -- did not.
23      Q.   -- and do you have any scientific or
24    technical training from school before you became a
25    lawyer?
```

Page 10

1      A.    Not of any particular note,
2  different from any other college graduate.
3      Q.    Okay.  So you don't consider
4  yourself a scientist or an engineer or -- or a
5  specialist in any particular technology?
6      A.    I do not.
7      Q.    Now, this case is about Voice over
8  Internet Protocol telephony, or what people call
9  "VoIP telephone service."
10          Just to be clear, you don't have any
11  technical training in -- in Voice over IP
12  telephony or -- or any expertise in that area,
13  true?
14      A.    I do not.  I'm familiar with some
15  cases applying those technologies, but I'm not
16  steeped in the science or engineering or specially
17  trained in either of those fields.
18      Q.    Now, in this case, you submitted a
19  declaration expressing some of your legal
20  opinions.
21          Have you done that sort of thing in
22  other District Court cases before?
23      A.    Yes, I have submitted declarations
24  in several proceedings both in Europe and in the
25  United States in maybe a handful or fewer

Page 11

1  instances.
2      Q.    On what sorts of issues?
3      A.    Almost always American patent law,
4  particularly Federal Circuit precedents.
5      Q.    And have you done that in the
6  United States as well?
7      A.    I think so, although I -- I recall
8  in one case in the Eastern District of Texas --
9  although I couldn't give you the name, but I think
10  I've done a -- a -- a deposition or a
11  declaration -- not a deposition -- a declaration
12  in one U.S. case at least.
13      Q.    Have you ever submitted a
14  declaration like the one you submitted in this
15  case that has to do with an application for
16  attorney's fees or sanctions?
17      A.    Not that I recall.
18      Q.    Now, because of your declaration in
19  this case, we sit here today and you're giving a
20  deposition.  I appreciate your time.
21          Have you sat for depositions before?
22      A.    Not that I recall.  I have been
23  examined in trial courtrooms in a couple cases,
24  but I don't recall sitting for a deposition as a
25  witness prior to today.

Page 12

1      Q.    What kind of preparation did you do
2  to prepare for sitting for the deposition today?
3      A.    I refreshed my recollection by
4  rereading the primary documents, including
5  the patent and the two Federal Circuit opinions,
6  reviewed as well a transcript of the argument in
7  the Sipnet case.  And I looked at the --
8  particularly, reply reports of Mr. Cole and other
9  basic documents that were front and central to the
10  preparation in January 2019 of Mr. Fenster for the
11  oral argument, and -- and the same documents were
12  relevant to the opinion that I gave in my August
13  declaration.
14      Q.    So did you -- did you review
15  anything to prepare for the deposition today that
16  you had not previously reviewed to help
17  Mr. Fenster prepare for his oral argument at the
18  Federal Circuit?
19      A.    I'm not certain whether I had seen
20  the Cole reply declarations before, but in the
21  case of the other documents I mentioned, I had
22  studied them in early January.  I believe that my
23  sessions with Mr. Fenster were on the 7th and 9th
24  of January, and I began reading the briefs and
25  selected parts of the appendix either in the last

Page 13

1  couple of days of December or in the early days of
2  January leading up to January 7th, the first of
3  the two sessions.
4          And then, of course, I continued to
5  reread the documents in between the first and
6  second sessions, so the second being on the 9th.
7          So I believe it's fair to say that
8  the documents that I looked at to prepare for
9  today's deposition were almost entirely the same
10  as the documents I had looked at in preparing for
11  the sessions with Mr. Fenster.
12      Q.    And just so I'm clear on the
13  documents, you talked about the Cole reply
14  declarations.  I -- I just want to make sure I
15  understand what you're referring to.
16          Are you talking about actual
17  declarations, or are you talking about expert
18  reports?
19      A.    I'm referring to declarations.
20      Q.    Okay.  Thank you.
21          Now, I assume you're being
22  compensated for your time on the project for
23  Mr. Fenster?
24      A.    What do you mean by "the project"?
25      Q.    Well, that's a good question, so

Page 14

1   let's break it down.
2           So were you compensated for the help
3   in preparing for the Federal Circuit oral
4   argument?
5       A.   I haven't yet submitted invoices to
6   Mr. Fenster for the January prep sessions, but I
7   intend to do so.  I don't intend to submit
8   invoices in connection with providing the
9   declaration or preparing for this deposition or
10  this deposition itself because that was not the
11  scope of my retention.
12          My retention was to help Mr. Fenster
13  prepare for the oral argument in January, which I
14  did.  And then I had no involvement, really, in
15  the case between January 9th and at some point in
16  the summer, perhaps in July -- I think it was in
17  July -- when I was informed about the pending
18  motion and related briefing and argument.  So that
19  was sort of the first time that the case came back
20  to my attention.
21      Q.   And what are -- what are the terms
22  of your compensation for the preparation for the
23  oral argument at the Federal Circuit?
24      A.   Our agreement and what I intend to
25  invoice was at my standard hourly rate of $2,000

Page 15

1   per hour.
2       Q.   And why will you not be charging for
3   the deposition preparation time?
4       A.   Because it's -- it seems, to me, it's
5   beyond the scope of the original retention, and
6   rather than trying to enlarge the retention
7   understanding or reach a new one, I decided to --
8   to just respond with a declaration after
9   refreshing my memory.  And this session was an
10  outgrowth of the declaration that I filed, so I
11  consider it separate from the retention, and
12  that's why I don't intend to send an invoice for
13  the time.  And I haven't actually even kept track
14  of the hours.
15      Q.   How many hours will you be billing
16  for the oral argument preparation?
17      A.   My recollection is that it's in the
18  teens -- I think 12 or so, or maybe 14 hours -- as
19  I said, in the last couple of days of December or
20  the first week of January.
21      Q.   Okay.  So let's take a look at your
22  declaration that you submitted in this case, and I
23  will mark it as Deposition Exhibit Number 1.
24
25

Page 16

1               -  -  -
2           (Deposition Exhibit Number 1,
3           Declaration of Honorable Paul R.
4           Michel (Ret.), marked for
5           identification, as of this date.)
6
7           THE WITNESS:  Yes, I have a copy
8       of it.
9           Thank you.
10  BY MR. DESMARAIS:
11      Q.   And so I've handed you what we've
12  marked as Deposition Exhibit Number 1, which is
13  entitled Declaration of Honorable Paul R. Michel,
14  dated August 1, 2019, and it appears to have your
15  signature on the bottom of the first page.
16          Is this the declaration you
17  submitted in this case?
18      A.   Yes.  This is a copy of the
19  declaration that I submitted in this case.
20      Q.   Now, if we turn to the first
21  paragraph, it says, I was retained in late 2018 by
22  Russ August & Kabat to consult regarding
23  preparation for oral argument before the Court of
24  Appeals for the Federal Circuit in Straight Path
25  IP Group, LLC versus Apple Incorporated and Cisco,

Page 17

1   Incorporated, and then it gives the docket
2   numbers, scheduled for early January 2019.  The
3   appeal was from the District Court's order
4   granting summary judgment of noninfringement in
5   favor of the Defendants.
6           Do you see that?
7       A.   Yes.
8       Q.   And that's as you told us -- that's
9   when your retention started with Mr. Fenster and
10  Straight Path; is that right?
11      A.   Yes, it was -- I believe it was in
12  December, I think, in the second half of December,
13  but I couldn't tell you the exact date.
14      Q.   And then in the second paragraph, it
15  says, Over the course of approximately two weeks,
16  I studied the briefs and appendix for about
17  14 hours --
18      A.   Yes.
19      Q.   -- and that's essentially what you
20  just told us, right, 12 to -- 12 --
21      A.   Yes.
22      Q.   -- 14 hours, something like that?
23          And then it says, On October [sic]
24  7th and 9th, I met with Mr. -- excuse me -- with
25  Marc Fenster, who was to present oral argument,

Page 18

1  and two colleagues, exploring challenges I
2  expected would be made to the planned arguments.
3           Do you see that?
4      A.   Yes, I see that, but it was not
5  October; it was January.
6      Q.   Did I say "October"?
7      A.   Yes.
8      Q.   I'm sorry.
9      A.   The document says "January," and it
10 was January.
11     Q.   Yeah.  Sorry.  I misspoke.  Thanks
12 for correcting the record.
13          Were you doing sort of mock
14 arguments on those days?
15     A.   The two sessions on January 7th and
16 January 9th were a combination of reviewing
17 documents, discussing the arguments as made in the
18 briefs and trying to identify potential lines of
19 questioning.  And at least one of the sessions, we
20 did some actual moot court-style questioning, but
21 a substantial part, as I recall, of particularly
22 the first session was trying to clarify on the
23 technology, on the claim construction and on what
24 the different documents stated.
25     Q.   Is that what you meant by, in

Page 19

1  Paragraph 2, quote, Exploring challenges I
2  expected would be made to the planned arguments,
3  closed quote?
4      A.   Yes.
5      Q.   Did you mean anything else besides
6  what you just described by those words?
7      A.   Well, I'm not sure what you mean did
8  I mean anything else.
9      Q.   Let me rephrase.
10          Did -- so what -- what did you mean
11 in your declaration when you said you were
12 exploring challenges of the planned arguments?
13     A.   Well, I was trying to anticipate
14 lines of questioning that various potential panel
15 members might pursue.
16          As I recall, the identity of the
17 panel was not known, and so to some extent, I had
18 to sort of assume a typical panel.  Normally,
19 they're randomly drawn.  So it could be any three
20 judges of 12 active and six senior judges who sit,
21 in most cases, only part-time.
22          So to some extent, it was generic,
23 but to some extent, I tried to personalize it in a
24 sense of if you get Judge X, he or she is likely
25 to pursue this line.  So there was a certain

Page 20

1  amount of speculating about possible panel
2  members, but -- but the main focus was on
3  what, given the briefing and the ruling by
4  Judge Alsup, I thought any panel member was likely
5  to ask.
6      Q.   Now, you didn't attend the oral
7  argument, as I understand it, but you did listen
8  to it afterwards, right?
9      A.   I did not attend the oral argument,
10 and it's been my practice never to attend the oral
11 arguments in cases in which I've helped either
12 with the briefing or the oral argument preparation
13 or both.  And I followed that practice in this
14 case, and I did not attend it.
15          I don't recall whether I heard the
16 audio recording or not.
17     Q.   Okay.  But you know the Court of
18 Appeals affirmed Judge Alsup with a Rule 36
19 affirmance, right?
20     A.   I'm aware of that.
21     Q.   And a Rule 36 affirmance means that
22 the Federal Circuit didn't feel it needed to write
23 an opinion; it's, essentially, just a summary
24 affirmance adopting Judge Alsup's reasoning,
25 right?

Page 21

1      A.   Well, I don't think I would entirely
2  agree with that characterization of it.
3          When I was first on the Court,
4  starting in 1988, Rule 36 dispositions [verbatim]
5  were used almost entirely in cases that were
6  pro se cases, which often were frivolous.  Many
7  were in the area of personnel, people who were
8  fired -- fired for misconduct or nonperformance
9  and who contested the firing.  And in rare
10 instances, according to my recollection, in
11 those years, the '80s and '90s, Rule 36
12 dispositions were limited to pro se -- pro se cases
13 or cases that the Court thought were frivolous or
14 close to frivolous.
15          In more recent years, particularly
16 since my retirement in 2010, the workload of the
17 Federal Circuit has increased substantially and so
18 has the use of Rule 36 no-opinion affirmances.
19 And it's my impression, although I haven't kept
20 rigorous records -- but it's my impression that
21 Rule 36 affirmances are now very common in both
22 District Court cases and cases arising from the
23 Patent Trial and Appeal Board.
24          So the practice seems to have
25 changed quite dramatically before 1988 to today in

Page 22

1   terms of the frequency or the circumstance in
2   which the Court has issued a so-called Rule 36
3   affirmance.
4        Q.   Would it be fair to say that the
5   Rule 36 affirmance, although it expanded since
6   your time on the Court, is a clear indication that
7   the Federal Circuit didn't think much of the
8   strength of Straight Path's appeal?
9        True?
10       A.   No, I wouldn't agree with that at
11  all.  There are many reasons a panel might choose
12  to not write an opinion, and I don't think that in
13  recent years the reliance on a Rule 36 opinion, as
14  opposed to a nonprecedential fuller opinion or a
15  precedential formal opinion, is any kind of a
16  reliable indicator of the strength or weakness of
17  the appellate arguments.
18       Q.   Well, we don't know in this case,
19  right, because they didn't write an opinion?
20       A.   We don't know what?
21       Q.   We don't know what the Federal
22  Circuit was thinking; is that what you're telling
23  us?
24       A.   I don't know what the
25  Federal Circuit Judges were thinking when they

Page 23

1   elected to affirm under Rule 36, but what I was
2   thinking is that it doesn't necessarily indicate
3   anything about the closeness of the issues on
4   appeal or the strength of the contentions advanced
5   by the appellant, or the appellee, for that
6   matter.
7        Q.   But it is an indication that they
8   didn't think there was something wrong with
9   Judge Alsup's opinion and that there was nothing
10  for them to write about, right?
11       A.   Well, the affirmance indicates that
12  they found that Judge Alsup's opinion to be affirmable
13  under the standards of review and the other
14  requirements of appellate review.
15       Was there another part of your
16  question?
17       Q.   And that they didn't find anything
18  to write about.
19       A.   Well, they didn't write anything,
20  and you could infer that they didn't think it was
21  necessary to write anything, but there are other
22  possible explanations, and I don't want to
23  speculate in this case on what they might have
24  been because it would be pure speculation since I
25  have no way of knowing.

Page 24

1        Q.   Okay.  I'd like to look at some of
2   your correspondence with Mr. Fenster and Straight
3   Path's counsel.
4        MR. DESMARAIS:  Let me mark as
5        Exhibit 2 a collection of e-mails.
6        -   -   -
7        (Deposition Exhibit Number 2,
8        Collection of e-mails, Bates
9        stamped SP-MICHEL00001673 through
10       SP-MICHEL00001674, marked for
11       identification, as of this date.)
12       -   -   -
13  BY MR. DESMARAIS:
14       Q.   Okay.  Exhibit 2 is a collection of
15  e-mails between yourself and Mr. Fenster; is that
16  correct?
17       A.   Yes.
18       Q.   If we look on the bottom of the back
19  side to the first e-mail, that one is dated
20  January 14th, 2019, and it appears to be from
21  Mr. Fenster to yourself; is that right?
22       A.   Yes.
23       Q.   And he thanks you for the argument
24  prep and asks you if you had a chance to look at
25  the argument -- excuse me -- listen to the

Page 25

1   argument.
2        Do you see that?
3        A.   Yes.
4        Q.   And then you respond on January 21
5   that -- Sorry about the delay, but then you did
6   have a chance to listen to the argument.
7        Do you see that?
8        A.   Yes, I do.
9        Q.   And then there's a gap then from
10  January 21 to the next e-mail, which was
11  June 26th, 2019.
12       Do you see that?
13       A.   Yes.
14       Q.   Was -- was that e-mail on -- and
15  that e-mail on June 26th, 2019, is from
16  Mr. Fenster to you; is that right?
17       A.   Yeah, there are two e-mails here.
18  But I see the date June 26th.
19       Q.   Yeah.
20       Do you see the one that's at the
21  time stamp of 1:40 p.m. is Marc Fenster wrote to
22  Judge Michel?
23       A.   Yes, I see that one.
24       Q.   Okay.  Was that the -- as far as you
25  can recall, the first contact that Straight Path

Page 26

1   or Mr. Fenster made to you since the oral argument
2   work?
3        A.   I'm not sure, but I think that's
4   probably correct.
5        Q.   So between those two dates, between
6   the January 21, 2019, when you commented on the
7   oral argument, and Mr. Fenster's reachout in
8   June 26th of 2019, had you done any work on this
9   case for Mr. Fenster or for anyone?
10       A.   Between January and June?
11       Q.   Yes.
12       A.   No.
13       Q.   And then it looks like you responded
14   yes, that you would have a call, and you sent your
15   phone number, and then later that day, Mr. Fenster
16   responded and said he'll look forward to talking.
17            Do you see those series of e-mails?
18       A.   Um-hum.  Yes, I do.
19       Q.   And -- and then did you have a call?
20       A.   Yes.
21       Q.   And what did Mr. Fenster tell you in
22   the call, as best you can recall?
23       A.   Well, he informed me about the
24   pending fee issue and asked me if I would be
25   willing to file a declaration.  There may have

Page 27

1   been several calls.  I -- I don't recall exactly
2   how many.  But the gist of the exchange was
3   whether I would file a declaration about my
4   impressions from January, in preparing him for the
5   oral argument, as to the persuasiveness or
6   reasonableness of the contentions he intended to
7   present on appeal and that were set forth in the
8   briefing as well.  And I indicated I would.
9            MR. DESMARAIS:  I'll mark as
10           Deposition Exhibit Number 3 an e-mail
11           from the next day.
12           -  -  -
13           (Deposition Exhibit Number 3, E-mail
14            string, Bates stamped
15            SP-MICHEL00001678 through
16            SP-MICHEL00001679, marked for
17            identification, as of this date.)
18           -  -  -
19   BY MR. DESMARAIS:
20       Q.   Deposition Exhibit Number 3 is an
21   e-mail from Mr. Fenster to you dated June 27th,
22   2019; is that right?
23       A.   Yes.  Um-hum.
24       Q.   And he says in the first paragraph,
25   Attached is a proposed draft language for your

Page 28

1   consideration.
2            Do you see that?
3        A.   Yes.
4        Q.   So Mr. Fenster or someone in his
5   office wrote the first draft of your declaration;
6   is that true?
7        A.   Well, I suggested to Mr. Fenster in
8   these phone calls that since many months had
9   passed since I last worked on the case, that it
10   would be helpful to me if he could focus my memory
11   on key issues, and I suggested that he might even
12   identify some specific points that he would hope I
13   would make if I agreed with them.  And he did
14   that, and I received his outline of the points
15   that were of interest to him, and I read that.
16            And I subsequently sat down at my
17   computer and, with my pitiful two-fingered typing,
18   typed out the very brief declaration that I
19   subsequently filed with -- or sent to Mr. Fenster,
20   which he subsequently filed in this case.
21       Q.   In Paragraph 2 of Exhibit 3, the
22   January -- excuse me -- the June 27 e-mail,
23   Mr. Fenster writes, I sincerely appreciate --
24   appreciate your willingness to consider our
25   request for an affidavit.  I know that this would

Page 29

1   be a significant departure from your practice and
2   policy.
3            Do you see that?
4        A.   Oh, yes, the second sentence.
5            Yes, I see that.
6        Q.   What was Mr. Fenster referring to,
7   as far as you understood, when he said that "this
8   would be a significant departure from your
9   practice and policy"?
10       A.   Well, I have gone to some lengths in
11   the nine years-plus since retiring from the
12   Federal Circuit to avoid being a witness in
13   proceedings in front of district judges in the
14   United States on the sense that, to me, it seemed
15   awkward for me to assume a role as a witness in
16   front of district judges who, at least in theory
17   and maybe actually in fact, I had been reviewing,
18   at least to the extent of patent-related rulings
19   in their cases, and so I have not made it a
20   practice of appearing as a witness.
21            As I said earlier in answer to your
22   previous question, I think I filed some kind of
23   brief declaration in the Eastern District of
24   Texas, but it may only have been a report about a
25   mediation, not a factual or legally oriented

Page 34

1    look -- look like; is that right?
2         A.   Well, this was my articulation of
3    what I was prepared to say.  And I sent it to him
4    to see if he thought it would be relevant and
5    useful, given his knowledge of the pending
6    proceeding; and the best I can recall, he said it
7    would be; and that this or something nearly
8    verbatim -- this text -- was, in fact, filed.
9         Q.   So the Paragraphs 1 through 5 that
10   we see at the top of Exhibit 5 ultimately, in
11   large part, if not entirely, became your
12   declaration?
13        A.   Yes.
14        Q.   Now, it's true, isn't it, that you
15   changed some of the words from what Mr. Fenster
16   had proposed to you, some -- some of it you kept
17   and some of it you changed, essentially made it
18   your own; is that right?
19        A.   Well, as I said, I -- I put it
20   aside.  I read it, maybe several times, and then I
21   put it aside and wrote out what I was prepared to
22   say.  And some of it reflected what he had
23   written, and some of it didn't.
24        Q.   Now, you mention in the declaration,
25   in your declaration, which is Exhibit 1 -- but

Page 35

1    it's also in the top of this e-mail -- that you
2    spent time on the oral argument preparation and
3    meeting with Mr. Fenster in January to prepare for
4    the oral argument and that you reviewed materials
5    at that time.
6              Putting that aside, between then and
7    the drafting of this declaration in June, did you
8    do anything to prepare the declaration?  Did
9    you -- did you break out those materials and
10   study, or did you just base the declaration on the
11   draft that Mr. Fenster had sent you?
12        A.   Well, I based the declaration on my
13   recollection of my views about this case, and that
14   recollection had been refreshed, to some extent,
15   by the conversations and e-mails between myself
16   and Mr. Fenster.  And I believe I looked at some
17   documents as well, but I couldn't tell you for
18   sure exactly which ones.
19        Q.   Am I right that you did not review
20   Cisco's brief for why it was entitled to
21   attorney's fees?
22        A.   I don't believe I've seen that.
23        Q.   And -- and you didn't look at
24   Apple's brief for why it was entitled to
25   attorney's fees?

Page 36

1         A.   I don't believe I've seen either of
2    those briefs.
3         Q.   And so you wouldn't have read the
4    arguments or the exhibits to those briefs; is that
5    fair?
6         A.   That's fair.
7         Q.   And am I right that you did not
8    review the reports of Cisco's experts or of
9    Apple's experts?  Right?
10        A.   Not if they were attached to those
11   briefs, because I -- I didn't see the briefs, so,
12   obviously, I wouldn't have seen anything attached
13   to the briefs.
14        Q.   No, of course, but even putting
15   aside the -- those briefs, just in general, you
16   didn't have a copy of Cisco's expert report on
17   noninfringement or invalidity, did you?
18        A.   I don't think so.
19        Q.   And -- and you didn't have, for
20   instance, technical manuals on Cisco's products,
21   right?
22        A.   No.
23        Q.   And -- and you, of course, didn't
24   review the source code of how Cisco's products
25   worked, right?

Page 37

1         A.   Of course not.
2         Q.   Yeah, that's what I thought.
3              Now, did you review any of the sort
4    of interactions of the parties through the
5    prosecution of the litigation?
6              Did you, to make an assessment of,
7    you know, Straight Path's conduct in the
8    litigation?
9              I don't mean their appeal position,
10   but I mean how the litigation was litigated.
11        A.   In front of Judge Alsup?
12        Q.   Yes.
13        A.   No.  I had no knowledge of that
14   except retroactively from reading the briefs and
15   portions of the appendix that were given to me by
16   Mr. Fenster I think in late December of 2018.
17        Q.   Okay.  Now, if you could look at
18   Exhibit 4, which is the -- the draft -- draft
19   declaration that Mr. Fenster sent you.
20              I notice that in Paragraph 3 there
21   was a sentence in there that talked about -- in
22   the fourth line of Paragraph 3, it says, I engaged
23   with counsel at length address -- addressing
24   Straight Path's infringement positions.
25              Do you see that?

Page 42

1  the impression that they had or were presenting
2  bad faith, frivolous or sanctionable argument.
3          Do you see that?
4      A.  Yes, I see his Paragraph 8.
5      Q.  Yeah.  And he had it phrased as "had
6  or were presenting bad-faith arguments."
7          In your Paragraph 5, you changed it
8  to a focus on the arguments that were being
9  presented to the Federal Circuit, which is what
10 your task was, right?
11     A.  I'm sorry.  I didn't hear the last
12 part.  Which was what?
13     Q.  Which is what your task was, which
14 was your -- what your assignment was.
15     A.  Yes.
16     Q.  You weren't talking about what
17 Straight Path had done in the past regarding its
18 infringement position or its conduct in the
19 District Court, right?
20     A.  Well, as I said, I had not studied
21 the proceeding from beginning to end in the
22 District Court; and, therefore, I didn't have any
23 knowledge and, accordingly, couldn't take any
24 position.  But as I mentioned earlier, to the
25 extent that the appellate arguments addressed the

Page 43

1  correctness of the District Court's grant of
2  summary judgment -- to that extent, I was focusing
3  on what happened in front of Judge Alsup, but not
4  the entire course of the proceedings, because
5  until his order, I had little or no knowledge
6  about the earlier stages of the proceeding in
7  front of Judge Alsup.
8      Q.  Understood.
9          So now getting back to your
10 declaration, which is Exhibit 1.  I already asked
11 you, but let me ask it again so that I can
12 continue on.
13          Paragraphs 3, 4 and 5 outline your
14 legal opinions in this case, right?
15     A.  As I said, I think that's a fair
16 characterization of the gist of those three
17 numbered paragraphs.
18     Q.  Let me show you --
19         MR. DESMARAIS:  Actually, before I
20 do that, let me mark as Exhibit 6 one
21 more e-mail I almost forgot to do, to
22 complete the record.
23              -  -  -
24         (Deposition Exhibit Number 6, E-mail
25          string, Bates stamped

Page 44

1          SP-MICHEL00001698 through
2          SP-MICHEL00001699, marked for
3          identification, as of this date.)
4              -  -  -
5  BY MR. DESMARAIS:
6      Q.  Exhibit 6 appears to be, I think,
7  the final in this series of e-mails.  This one has
8  in the middle of the page your June 30 e-mail,
9  where you send your preferred paragraphs.  And
10 then it looks like Mr. Fenster responds on
11 June 30th, and then you respond on June 30th, and
12 then he sends you a -- form of that that can be
13 executed.
14          Do you see all that --
15     A.  Yes --
16     Q.  -- correspondence?
17     A.  -- I do.
18     Q.  Now, during this time period, did
19 you talk at all live with Mr. Fenster, or are the
20 e-mails that we have been looking at the extent of
21 the communications you had at the time about the
22 declaration?
23     A.  I can't say for sure that there were
24 no telephone discussions, but I don't remember
25 any.

Page 45

1          As I recall, in this time frame of
2  the last couple of days of June, it was just all
3  about the mechanics of getting a properly signed
4  version of the formally composed declaration
5  executed and transmitted back to Mr. Fenster, so I
6  think it was all mechanics.
7      Q.  Okay.
8          All right.  So let me -- let me ask
9  you this, then:  So on your -- on your
10 declaration, Exhibit 1, which finally got executed
11 that we're looking at as Exhibit 1 -- those legal
12 opinions that are in Paragraphs 3, 4 and 5 are
13 opinions of yours, right?
14     A.  Yes, I can accept that
15 characterization of the nature of those three
16 paragraphs: opinions, judgments, conclusions.  We
17 could quibble about the words, but I don't quibble
18 with calling them "opinions."
19     Q.  And -- and you understand that the
20 Federal Rules of Civil Procedure require the
21 disclosure of opinions and there are certain rules
22 around that, including Federal Rule of Civil
23 Procedure 26, which talks about disclosure of
24 opinions, right?
25     A.  I'm -- I'm generally aware of the

Page 46

1  Federal Rules, yes.
2      Q.   All right.  Let's take a look at
3  Rule 26.  I've marked it as Exhibit 7.
4                  - - -
5           (Deposition Exhibit Number 7,
6           Federal Rule of Civil Procedure 26,
7           marked for identification, as of
8           this date.)
9                  - - -
10  BY MR. DESMARAIS:
11      Q.   So I've placed before you Exhibit 7,
12  which is Federal Rule of Civil Procedure 26.
13           Do you see that?
14      A.   Um-hum.
15      Q.   If we look at 26(2) -- 26(a)(2), do
16  you see how it talks about the Disclosure of
17  Expert Testimony?
18      A.   Um-hum.
19      Q.   And then if we go up to the -- the
20  top of the second page, which is (a)(2)(b),
21  Witnesses Who Must Provide a Written Report.
22           Do you see that?
23      A.   Yes.
24      Q.   And it says, If -- in the third
25  line, after the hyphen there, If the witness is

Page 47

1  one retained or specially employed to provide
2  expert testimony in the case.
3           We can stop there.
4           That would fit what you did here,
5  right?  You were retained to provide your opinions
6  in this case, right?
7      A.   Well, I don't know that I would
8  consider it expert testimony.
9      Q.   It is opinion testimony.
10           You agree with that, right?
11      A.   Well, in a manner of speaking, it's
12  opinion testimony, yes, but it's not comparable,
13  in my understanding, to the typical expert
14  witness, who files a report and maybe a subsequent
15  report and attaches all kinds of exhibits, and so
16  forth.
17           I didn't consider that the nature of
18  what I was doing with this declaration, and I
19  didn't make any reference to Rule 26.
20      Q.   Right.
21           Whether you made reference to it or
22  not -- maybe we can -- maybe we can jump to -- let
23  me mark as the next exhibit, Number 8,
24  Federal Rule 702.
25

Page 48

1                  - - -
2           (Deposition Exhibit Number 8,
3           Federal Rules of Civil Procedure
4           702, marked for identification, as
5           of this date.)
6                  - - -
7  BY MR. DESMARAIS:
8      Q.   If you look at Exhibit Number 8,
9  which includes Federal Rule 702, 702 says, A
10  witness who is qualified as an expert by
11  knowledge, skill, experience, training, or
12  education may testify in the form of an opinion or
13  otherwise if:
14           And then (a) is the expert's
15  scientific, technical, or other specialized
16  knowledge will help the trier of fact to
17  understand the evidence or to determine a fact in
18  issue.
19           Do you see that?
20      A.   I see it.
21      Q.   And your opinion testimony, while
22  it's not scientific or technical, would certainly
23  be other specialized knowledge, right?
24      A.   I don't know that I would agree with
25  that.  I -- I -- I was -- I made no reference to

Page 49

1  Rule 702 in preparing my declaration and I didn't
2  consider myself to be an expert witness in the
3  normal sense.
4      Q.   So -- so let's talk about -- you do
5  agree, your declaration -- I think we already
6  established this -- Paragraphs 3, 4 and 5 are your
7  opinions, right?
8      A.   Well, yes, they were my conclusions,
9  my beliefs, my judgments, my opinions as an
10  individual with some experience, but I don't
11  consider that I was holding myself out in this
12  declaration as being some kind of technical expert
13  on the issues before the Court.
14      Q.   But you were holding yourself out as
15  a legal expert on the issues before the Court,
16  true?
17      A.   Well, I was -- I considered that I
18  was holding myself out as somebody with the --
19  some considerable knowledge of Federal Circuit
20  precedent on claim construction and on the
21  requirements of disclaimer and like matters.
22      Q.   And those are legal issues, right?
23      A.   Those are legal doctrines in
24  precedential opinions of the Federal Circuit, yes.
25      Q.   And so the opinions expressed in

Page 54

1  kind of detail or attachments that are called for
2  in Items (i) through (vi) under (B) at the top of
3  Page 2.
4          Q.   So if that's the case and if I'm
5  correct that Rule 26 does apply, you would agree
6  with me, then, that it would it be fair to say
7  that Judge Alsup would be within his discretion to
8  strike the declaration as not complying with
9  Rule 26?
10         A.   I wouldn't venture to give an
11 opinion on what Judge Alsup would be justified in
12 doing or not doing with respect to the
13 declaration.
14         Q.   But you agree that your declaration
15 doesn't apply with Rule 26?
16         A.   Yes, that -- that's certainly true.
17         Q.   Now, if we look back, then, at your
18 declaration -- well, before we go on, we might as
19 well do Rule 702 as well.  And this is
20 Exhibit Number 8.
21              And -- and under 702, it says --
22 well, you know what, put it aside.  I'll do it
23 later because I don't want to get off -- off my --
24 my progression here.
25              Let's look at -- let's look at your

Page 55

1  declaration, which is Exhibit 1.  And you say in
2  Paragraph 3, I became convinced that the arguments
3  why the evidence met the standard needed to avoid
4  summary judgment, consistent with claim
5  construction by the appellate court in its opinion
6  in an appeal from a decision in an IPR, were
7  reasonable and had factual support in the record
8  below.
9              Do you see that?
10         A.   Yes.
11         Q.   So let's take a look, then, at
12 Judge Alsup's opinion in that regard.
13              MR. DESMARAIS:  Let's mark this as
14              Exhibit 9.
15                       -  -  -
16              (Deposition Exhibit Number 9, Order
17              Granting Motions for Summary
18              Judgment of Noninfringement and
19              Order to Show Cause, marked for
20              identification, as of this date.)
21                       -  -  -
22 BY MR. DESMARAIS:
23         Q.   Exhibit 9 is Judge Alsup's order
24 granting summary judgment; is that right?
25         A.   Yes.

Page 56

1          Q.   The one that was on appeal in this
2  case, right?
3          A.   Yes.
4          Q.   Now, if you look on the first page
5  under Statement, Judge Alsup writes, The essence
6  of this order is that the patent owner saved
7  its patents from invalidity by making clear-cut
8  representations to the Federal Circuit,
9  representations that cannot now -- that it cannot
10 now disavow in order to prove its infringement
11 case.
12              You agree, don't you, that if a
13 representation was made to the PTO or to the
14 Federal Circuit by Straight Path to save validity,
15 that Straight Path can't disavow that statement to
16 prove infringement?
17              You agree with that as a
18 proposition, don't you?
19              MR. FENSTER:  Objection:
20              incomplete hypothetical.
21              THE WITNESS:  I'm sorry.  What was
22              the question again?
23 BY MR. DESMARAIS:
24         Q.   The question is, You agree, don't
25 you, that if a representation was made to the

Page 57

1  Patent Office or to the Federal Circuit by
2  Straight Path to save the validity of its patent
3  claim, that Straight Path cannot disavow that to
4  prove infringement?
5              You agree with that as a general
6  proposition, right?
7          A.   Well, it depends on whether the
8  representation meets the case law requirements for
9  a disclaimer.
10              So not any representation would do,
11 but a representation that meets what I consider
12 fairly stringent requirements of unequivocal,
13 intentional surrender or disavowal or disclaimer
14 of scope.
15         Q.   And if Straight Path did that, you
16 would agree that they can't then undo those
17 statements to prove their infringement case,
18 right?
19         A.   If -- if anything said by
20 Straight Path qualifies under the case law as a
21 disclaimer, they're stuck with it.
22         Q.   All right.  Let's take a look at
23 Page 5 of Exhibit 9.
24              In the first block quote on Page 5,
25 Judge Alsup is referring to the brief that

Page 70

```
1   invention, and as I said earlier, I understand
2   Wodarski to be addressing a particular embodiment
3   but not the claimed invention, whereas Judge Alsup
4   apparently considers that the statement by
5   Wodarski had to do with the claimed invention.
6   And I don't think that's accurate.
7           From my reading of the exchanges --
8   the various exchanges between the judges and
9   Wodarski, he was not referring to the claim but
10  was referring to a particular embodiment.
11      Q.   You know the Federal Circuit
12  disagrees with you?
13          MR. FENSTER:  Objection: misstates
14      the record.
15          Go ahead.
16  BY MR. DESMARAIS:
17      Q.   You know the Federal Circuit
18  affirmed Judge Alsup's opinion in a Rule 36
19  affirmance, right?
20      A.   I'm aware of that.
21          MR. FENSTER:  We've been going
22      over an hour and 15, so when you get to
23      a convenient point to break.
24          MR. DESMARAIS:  We can stop now,
25      if you want.
```

Page 71

```
1           THE VIDEOGRAPHER:  Going off the
2       record at 11:16 a.m.
3               -  -  -
4           (Whereupon, a recess was taken from
5           11:16 a.m. to 11:31 a.m.)
6               -  -  -
7           THE VIDEOGRAPHER:  We are going
8       back on the record at 11:31 a.m.
9   BY MR. DESMARAIS:
10      Q.   Now, when we look at your
11  declaration, the -- I notice it doesn't give any
12  opinions on whether Straight Path's claims would
13  be valid if Straight Path's interpretation of the
14  infringement issue was correct.
15          Is that right?  You don't address
16  validity in your declaration?
17      A.   No, I did not address validity in my
18  declaration.
19      Q.   So if we look at Judge Alsup's
20  opinion, which is Exhibit 9, and we look at the
21  bottom of Page 13, paragraph starting at Line 25,
22  Judge Alsup concludes, Second, Straight Path's
23  infringement theory would expand its narrowly
24  preserved infringement theory into one of
25  breathtaking scope.
```

Page 72

```
1           Do you see that?
2       A.   I do.
3       Q.   You don't address that in your
4   declaration, right?
5       A.   No.
6       Q.   And then if we go to Page 14,
7   just -- Judge Alsup says, at the top on Line 1, As
8   Straight Path and Cole repeatedly point out, a
9   successful attempt to reach the second process
10  will of course indicate that the second process
11  was online and accessible at the time of the
12  attempt.  Similarly, insofar as the second process
13  must of course be online and accessible for
14  real-time communication to work, any call attempt
15  by the first process must necessarily entail a
16  question as to whether or not the second process
17  is online and accessible.
18          And then he concludes that paragraph
19  by saying, This cannot be the narrow infringement
20  theory the Federal Circuit had in mind.
21          Do you see that?
22      A.   Yes.
23      Q.   You don't -- you don't address that
24  at all in your declaration, right?
25      A.   Well, I don't understand what
```

Page 73

```
1   Judge Alsup means in the fourth line where he says
2   "any call attempt," because, as I understand the
3   claims and accused systems, the call isn't
4   attempted until after the status of the callee has
5   been confirmed, and then after that confirmation,
6   the server signals back to the callee device to go
7   ahead and initiate at the stated IP address the
8   actual voice communication; that's the whole point
9   of the claimed invention.
10          And in that circumstance, the call
11  will surely go through and, therefore, the point
12  of the invention is achieved because the risk of
13  the voice call failing, with the attendant costs
14  of time and money and bandwidth, and so forth,
15  that risk will be entirely avoided.
16          So I'm confused when Judge Alsup, in
17  Line 4, refers to "call attempt," because it
18  seems, to me, the call hasn't yet been attempted,
19  the way I understand the claimed invention and the
20  accused product.  And it may be that I was
21  similarly confused for a while because the diagram
22  that Judge Alsup includes in Page 10 of his
23  opinion is confusing in its labeling -- this is a
24  figure Number 1 at the bottom of the page, Page 10
25  of Judge Alsup's opinion -- because it refers to
```

Page 74

```
 1  a, quote, basic call, end quote, and then it
 2  indicates that the server is involved in the call,
 3  because the circle at the top of the triangle
 4  representing the server has the word "call" in it.
 5              In contrast, the arrows between
 6  "caller" and "server" and between "server" and
 7  "callee" are labeled "signaling," which I think is
 8  more accurate, according to my understanding of
 9  the invention.  And so the real call is the A-to-B
10  voice transmission, which in this diagram is
11  labeled "media."
12              So it seems, to me, that the
13  confusion about what is the call and what is only
14  signaling in preparation of trying to establish
15  the call is confusing, and the confusion may trace
16  back to the odd labeling of the different parts of
17  this particular diagram.  And I was somewhat
18  confused about this myself.
19              And in my declaration, as you
20  undoubtedly noticed, I talk about, in Paragraph 3,
21  I became convinced, the beginning of that
22  sentence.  And then in the end of the fourth line
23  and the beginning of the fifth line, I continue in
24  similar vein articulating that quote, I ultimately
25  considered the arguments for reversal to be
```

Page 75

```
 1  logical, et cetera, et cetera.
 2              And when I first started working
 3  with the --
 4      Q.   Judge Michel, have you lost sight of
 5  the question, because I didn't ask you any of
 6  this?
 7              MR. DESMARAIS:  Move to strike as
 8          nonresponsive.
 9              THE WITNESS:  Well, it -- it's --
10  BY MR. DESMARAIS:
11      Q.   I'm not sure which question
12  you're --
13      A.   -- it's responsive --
14      Q.   -- answering.
15      A.   -- to the use by Judge Alsup of the
16  word "call" in a way that seems, to me, to not be
17  correct.
18      Q.   That wasn't my question.
19              My question was, Did you state in
20  your declaration what the narrow infringement
21  theory was that the Federal Circuit had in mind,
22  which is what Judge Alsup was referring to.
23              Is it in your declaration, is what
24  my question was.  And the answer to that is yes or
25  no.
```

Page 76

```
 1              MR. FENSTER:  Objection.  That's
 2          not what your question was.  You asked
 3          whether you addressed this part of
 4          the -- Page 10, or Page -- whatever
 5          it was -- from the order in his
 6          declaration, and the Judge is
 7          explaining where in his declaration
 8          he's addressing those matters.
 9  BY MR. DESMARAIS:
10      Q.   If you look at Page 11 of
11  Judge Alsup's opinion, do you see the diagram on
12  Page 11?
13      A.   I do.
14      Q.   And you know this is the diagram
15  that Straight Path's expert is using, right?
16      A.   Yes.
17      Q.   And you know that this is based on
18  the SIP industry protocol, right?
19      A.   Yes.
20      Q.   You're not an expert in SIP, are
21  you?
22      A.   Correct.
23      Q.   Nonetheless, if you look at Line 9,
24  do you see the quote -- quoted language from the
25  SIP industry standard where it says, Phone can
```

Page 77

```
 1  route call, C-L- -- C-A-L-L -- phone can route
 2  call, trigger INVITE?
 3              Do you see that?
 4      A.   I see that.
 5      Q.   And then the INVITE is triggered
 6  after the phone can route the call.
 7              Do you see that, sir?
 8      A.   Yes.
 9      Q.   Okay.  Now let's go back to what I
10  was asking you about, which is on Page 14, Line 7.
11  Judge Alsup writes, Third, this expansion to
12  Straight Path's infringement theory rests on a
13  premise so patently obviousness -- so patently
14  obvious, it cannot possibly be the key to the
15  claimed invention.
16              Do you see that?
17      A.   I see that.
18      Q.   And you don't address -- address
19  validity or obviousness in your declaration, do
20  you?
21      A.   No.  As I said before, I didn't
22  address in any way validity in the declaration.
23      Q.   And if you look at Line 13, there's
24  a sentence that starts with the word "but."
25              Do you see that?
```

Page 78

1        A.    Yes, I see that.

2        Q.    After he describes the system, he

3   says, But the same would be true of any

4   point-to-point communication whether over a

5   computer network, landline, radio signal or other

6   medium.

7        A.    I see that.

8        Q.    Now, have you done an assessment of

9   cell phone communications as they existed at the

10  time Straight Path filed its patent?

11       A.    No.

12       Q.    Do you know whether the cell phone

13  communications in this country, at the time that

14  Straight Path filed its patent, worked the way

15  that Straight Path is claiming their invention

16  works?

17       A.    I'm not sure what you mean.

18             Can you -- can you restate the

19  question or repeat the question?

20       Q.    Do you know, one way or the other,

21  whether -- if Straight Path's infringement

22  position is correct, whether it would be so broad

23  that it would cover cell phones as they existed in

24  this country at the time they filed the patent?

25       A.    I would think not.

Page 79

1        Q.    Have you done that analysis, sir?

2        A.    I -- I have tried to focus on what

3   the patent document indicates to my understanding

4   that the claimed invention is, and the conclusion

5   I draw from, for example, Column 10 and Figure 8

6   is that there is an embodiment of the claimed

7   invention that requires a check and that,

8   therefore, in Line 10, when Judge Alsup uses the

9   word "merely," that seems, to me, to not be

10  correct.

11       Q.    I'm asking you whether you

12  considered validity in your declaration, sir.

13       A.    Well, I thought we already

14  established that I don't directly discuss validity

15  in the declaration.

16       Q.    Now let's take a look back at

17  Exhibit 8, which was Federal Rule of Evidence 702.

18  And earlier, we talked about how you're giving

19  opinion testimony in your declaration.  And if

20  Rule 702 were to be applicable to your opinion

21  testimony, it says, A witness who is qualified as

22  an expert by knowledge, skill, experience,

23  training, or education may testify in the form of

24  opinion or otherwise.

25             Do you see that?  Rule 702?

Page 80

1        A.    Yes.

2        Q.    And then it says, as the first

3   requirement, the expert has to have scientific,

4   technical, or -- or other specialized knowledge.

5        A.    Yeah, I see it, (a) to (d).

6        Q.    And you would -- you wouldn't fall

7   in the category of "scientific" or "technical";

8   you would be in the category of "other specialized

9   knowledge," if this rule applied.

10             Is that right, sir?

11       A.    Well, I don't know.  I -- I consider

12  that my opinions as reflected in my declaration

13  are in the nature of a predictor, a handicapper,

14  if you will, as to whether the arguments in the

15  briefs and planned to be made by Mr. Fenster had a

16  reasonable chance of being accepted by the Federal

17  Circuit.  So it doesn't seem, to me, that my

18  predictive judgments fit into either Rule 26 or

19  Rule 702, but that's for somebody else to decide.

20  But I didn't consider that I was the sort of

21  expert that those two rules seem, to me, to be

22  addressing.

23       Q.    But if Rule 702 did apply, the most

24  appropriate category for you would be "other

25  specialized knowledge" under Subparagraph (a),

Page 81

1   right, because it's not technical or scientific?

2             MR. FENSTER:  Incomplete --

3             improper hypothetical.

4   BY MR. DESMARAIS:

5        Q.    You're using your legal knowledge,

6   right, as the basis of your opinion?

7        A.    I'm using my knowledge of the case

8   law and the habits of many of the members of the

9   Federal Circuit to make an assessment in the

10  nature of a prediction, and whether that's a form

11  of expertise or not, I -- I don't know.

12       Q.    Rule 702 says, in -- in

13  Subparagraph (c), that the testimony has to be the

14  product of reliable principles and methods.

15             And (d) goes on to say, The expert

16  has reliably applied those principles and methods

17  to the facts of the case.

18             Do you see that?

19       A.    Yes.

20       Q.    What -- what principles and methods

21  did you use to reach your opinion that are

22  reliable in the industry?

23       A.    I used my knowledge of the case law,

24  of claim construction and of -- the requirements

25  for a disclaimer, for example, to form a

Page 82

1   prediction about whether the Federal Circuit might
2   well reverse the judgment of noninfringement --
3   summary judgment of noninfringement.
4              In my mind, it turned not so much on
5   the details of the technology but on the correct
6   understanding of the scope of the claim, so I was
7   able to make a prediction based on what I thought
8   the likely assessment would be of the panel
9   members as to the scope of the claim.
10       Q.   And you -- you list in your
11  declaration several times case law, but you don't
12  articulate the cases you're referring to, right,
13  in the declaration?
14       A.   No, they're not identified; and
15  they're well known, and they're discussed in the
16  Sipnet opinion and the Samsung opinion.
17       Q.   And you are --
18            MR. FENSTER:  Excuse me, John.
19            Just give the witness a chance to
20            finish his answer before you jump in
21            with a question.
22            MR. DESMARAIS:  Yes, of course.
23       Of course.  I thought he was finished.
24            MR. FENSTER:  Thank you.
25            THE WITNESS:  I'm sorry --

Page 83

1   BY MR. DESMARAIS:
2        Q.   The --
3        A.   -- I've lost track of where we are.
4        Q.   And -- and your opinions, as you
5   just described them, calling on your experience,
6   are based on, you know, your special knowledge of
7   Federal Circuit and the case law that you
8   described, right?
9             I mean, you're charging -- you're
10  charging a fee for those services to get access to
11  your specialized knowledge, right?
12       A.   As I say, I -- I don't want to
13  quibble with the use of the word "opinion," but it
14  seems, to me, it's more accurate to say that in
15  working with Mr. Fenster in January of 2019, I was
16  tying to help him optimize the prospects of his
17  arguments being accepted, and in the course of
18  doing that, I necessarily made some assessments or
19  predictions of the likely receptivity of the panel
20  members to such arguments.  And in my declaration,
21  I was recalling those predictions and assessments
22  that I made in January in the course of working
23  with Mr. Fenster over those two days.
24       Q.   Let me show you a Federal Circuit
25  case, which we'll mark as Exhibit 10.

Page 84

1                   -  -  -
2             (Deposition Exhibit Number 10, Case
3              cite, Sundance v. DeMonte
4              Fabricating, marked for
5              identification, as of this date.)
6                   -  -  -
7   BY MR. DESMARAIS:
8        Q.   I've marked as Exhibit 10 the
9   Sundance case from the Federal Circuit.
10            Do you see that?
11       A.   I do.
12       Q.   Are you familiar with this case?
13       A.   Not offhand.
14       Q.   If you look at Page 5, do you see
15  under Head Note 1, The Federal Circuit is
16  considering whether to admit the testimony of
17  Mr. Bliss as a patent law expert?
18            Do you see that?
19       A.   Yes.
20       Q.   Okay.  And then if you go to Page 7,
21  underneath the first -- in the first column,
22  underneath the block quote, there's a paragraph
23  that starts, Despite the absence of any suggestion
24  of relevant technical expertise, Mr. Bliss offered
25  expert testimony on several issues which are

Page 85

1   exclusively determined from the perspective of an
2   ordinary skill in the art.  In elaborate technical
3   detail, Mr. Bliss opined on how the disclosed
4   invention, accused system, and prior art operate,
5   including his opinions as to noninfringement and
6   the invalidity of Claim 1 of the '109 patent.
7             Do you see that?
8        A.   I see that.
9        Q.   And then if you go over to the
10  second column, underneath the footnote there,
11  Head Note 10, the paragraph that says, Admitting
12  testimony from a person such as Mr. Bliss, with no
13  skill in the pertinent art, serves only to cause
14  mischief and confuse the fact-finder.  Unless
15  the patent lawyer is also a qualified technical
16  expert, his testimony on these kinds of technical
17  issues is improper and thus inadmissible --
18       A.   Um-hum.
19       Q.   -- because Mr. Bliss was never
20  offered as a technical expert and, in fact, has
21  not qualified as a technical expert, it was an
22  abuse of discretion for the District Court to
23  permit him to testify as an expert on the issues
24  of noninfringement or invalidity.
25            Do you see that?

Page 86

1      A.   I do.
2      Q.   And then if you skip to Page 9, the
3  Federal Circuit concludes, towards the bottom of
4  that paragraph numbered Head Note 14, Allowing a
5  patent law expert --
6      A.   I'm sorry.  Page 9 -- oh, I see --
7      Q.   Yeah --
8      A.   -- 14.
9      Q.   -- under Head Note 14, towards the
10 bottom of the paragraph, Allowing a patent law
11 expert without any technical expertise to testify
12 on the issues of infringement and validity amounts
13 to nothing more than advocacy from the witness
14 stand.
15           Do you see that?
16     A.   Yes.
17     Q.   Am I right that, you know, as we've
18 already established, you're -- you don't have
19 technical expertise in the relevant art that the
20 Straight Path patents are -- appear or the Cisco's
21 products are in --
22     A.   Certainly not.
23     Q.   And you are, in fact, opining on the
24 legal patent law issues in this case, right?
25     A.   Not --

Page 87

1           MR. FENSTER:  Objection:
2      misstates.
3           THE WITNESS:  -- not -- not --
4      not -- not really.  I'm making a
5      prediction of what I think the
6      Federal Circuit panel members are
7      likely to conclude.
8           I'm not suggesting a technical
9      assessment or really anything having to
10     do with anything other than some
11     knowledge of the Federal Circuit and
12     its case law.  So it seems, to me, my
13     circumstance is not at all parallel to
14     the circumstance of Mr. Bliss as
15     discussed in this opinion.
16          I agree with this opinion, and the
17     parts that you have called to my
18     intention seem entirely sound, but it
19     seems, to me, they do not have any
20     relevance to the task I was attempting
21     to undertake in the declaration.
22 BY MR. DESMARAIS:
23     Q.   Weren't you giving opinions about
24 whether or not Straight Path's infringement claim
25 will be successful at the Court of Appeals?

Page 88

1      A.   I was making a prediction.  You
2  choose to use the word "opinion," but I find that
3  a little confusing, because an opinion letter by
4  an attorney to a client is one thing and a expert
5  opinion and testimony is another thing.  I don't
6  think that what I wrote in the declaration is
7  comparable to either of those, and that's why it
8  seems, to me, that the word "prediction" is a more
9  accurate way to characterize it.
10          But as I said at the outset, I don't
11 want to quarrel with you about the semantics of
12 your calling it an "opinion."  In the colloquial
13 sense of the word, it's an opinion.  It seems, to
14 me, it's more accurately described as a
15 prediction, but we can leave it there.
16     Q.   Okay.  Let me -- let's look at a
17 different case.
18          MR. DESMARAIS:  I'll mark this as
19     Exhibit 11.
20             -   -   -
21          (Deposition Exhibit Number 11,
22           Order, Diamondback v. Repeat
23           Precision, et al., marked for
24           identification, as of this date.)
25             -   -   -

Page 89

1  BY MR. DESMARAIS:
2      Q.   This is a case out of the
3  Western District of Texas, Diamondback case,
4  Exhibit 11.
5           Do you see that?
6      A.   I see the document, yes.  I see the
7  order.  I'm not familiar with it, but I see it.
8      Q.   So here in this case, the Court
9  considered a legal expert.  Let's -- let's take a
10 look at the language on -- if you look at Page 3,
11 the Court in -- in this case says -- the first
12 full paragraph on Page 3, The -- this Court
13 begins, as it must, with Rule 702 of the Federal
14 Rules of Evidence and applies the principles
15 articulated in Daubert versus Merrell.
16          Do you see that?
17     A.   Yes, I do.  I see it.
18     Q.   It says, The Court is well aware of
19 its role as gatekeeper with respect to the
20 admissibility and relevance of expert testimony.
21          And then there's a big block quote
22 there, which I'll skip over.
23          But then underneath, it says,
24 However, as Judge Yeakel observed, the limitations
25 on the Court's gate -- gatekeeping role are not so

Page 94

```
 1   considering the totality of the circumstances.
 2   Our holding in Octane settles this case:  Because
 3   Section 285 commits the determination whether a
 4   case is exceptional to the discretion of the
 5   District Court, that decision is to be reviewed on
 6   an appeal for abuse of discretion.
 7            Do you see that?
 8       A.   I see that.
 9            And I recall Octane when it came
10   out.
11       Q.   Yeah.
12            So Highmark makes it clear that
13   it's in Judge Alsup's discretion whether to
14   determine this case on a -- to be exceptional or
15   unexceptional?
16       A.   Without a doubt.
17       Q.   And that "exceptional" finding,
18   according to Highmark, can be based on one of two
19   things, that -- as we just read, the substantive
20   strength of the positions or the unreasonable
21   manner in which the case was litigated, right?
22       A.   Yes.
23       Q.   Now, on the first point, the
24   substantive strength of the positions, you're
25   submitting your declaration to try to influence
```

Page 95

```
 1   Judge Alsup's decision on that first prong, right?
 2       A.   Well, I consider that I'm trying to
 3   focus Judge Alsup's analysis when he makes his
 4   decision.  If it's appealed, it certainly will be
 5   governed by the discretionary or deferential
 6   review standard in Highmark and under the
 7   standards in Octane Fitness, for sure.  But that
 8   is a later state.  That's not where we were when I
 9   submitted the declaration.
10       Q.   Now, the second reason, according to
11   Highmark, that a case may be warranting of fees
12   is, quote, The unreasonable manner in which the
13   case was litigated, right?
14       A.   Yes.
15       Q.   And as you testified earlier today,
16   your declaration doesn't address at all how
17   Straight Path litigated this case; is that right?
18       A.   I'm -- as I said, I'm not aware of
19   the stage-by-stage litigation and what
20   Straight Path witnesses or its counsel did and
21   said week by week, month by month, through the
22   course of the proceeding.  So, of course, I don't
23   address that, I don't purport to address that,
24   couldn't address that in my declaration because I
25   was not knowledgeable about all of those facts.
```

Page 96

```
 1            So I express no opinion, I have no
 2   opinion, I have no basis on that precise point to
 3   have an opinion.
 4       Q.   In fact, Straight Path didn't even
 5   provide to you the brief that Cisco wrote or the
 6   brief that Apple wrote outlining the allegations
 7   about how Straight Path conducted this litigation?
 8       A.   That's correct.
 9       Q.   And, in fact, if we look at your
10   declaration, we don't see anywhere that you
11   actually cite Section 285 at all, do you?
12       A.   It's -- I do not cite 285.  It
13   seemed, to me, it didn't need to be cited.
14   Judge Alsup is well aware of the relevant
15   section and the case law, like Octane Fitness and
16   Highmark and the rest.
17       Q.   And your declaration doesn't discuss
18   anywhere Judge Alsup's inherent power to issue
19   sanctions or the -- or the Ninth Circuit law in
20   that regard, right?
21       A.   I don't address that, and the
22   content of the law is not debatable and well known
23   to me and Judge Alsup and everybody else who is
24   involved in cases like this.
25       Q.   And your declaration also doesn't
```

Page 97

```
 1   address Section 1927 nor the Ninth Circuit law
 2   that relates to sanctions under 1927, right?
 3       A.   I don't cite 1927 or Ninth Circuit
 4   law applying Section 1927.  I think that at least
 5   I would suggest that my declaration, at least by
 6   inference, suggests that the positions of
 7   Straight Path in the appeal argued in January were
 8   not in the "frivolous" category.
 9       Q.   Now, your declaration does not
10   anywhere opine on whether it would be an abuse of
11   discretion for Judge Alsup to grant fees in this
12   case?  Your declaration is silent about that,
13   right?
14       A.   Well, the declaration is very brief.
15   It speaks for itself.  We can all see exactly
16   what's included and what's not included.
17       Q.   Do you -- based on your time in this
18   case, which I understand to be limited to a few
19   days back in January reviewing the appellate
20   briefs and helping Mr. Fenster prepare for his
21   oral argument, do you believe that you're in a
22   better position than Judge Alsup, who's been
23   living with this case, to determine whether or not
24   he should issue fees or whether the case is
25   frivolous?
```

Page 98

1      A.    Well, obviously, the decision is up
2  to Judge Alsup.  Obviously, he has a much broader
3  base of knowledge than I do.
4            And what was the rest of your
5  question, then?  Maybe I'm not answering it.
6      Q.    As I understand your effort in this
7  case, you spent a few days back in January -- I
8  think you said it was two days -- back in January
9  helping Mr. Fenster get ready for the appellate
10  argument.
11      A.    Right.  Yes.
12      Q.    Is it your view that you're in a
13  better position to determine whether fees should
14  be awarded in this case, after those two days of
15  study, versus Judge Alsup, who's been living with
16  this case for its entire duration?
17      A.    No.  I don't purport that I'm in a
18  superior position, certainly not with respect to
19  trial court conduct about which I've acknowledged
20  I know absolutely nothing.  And with respect to
21  the potential merit of the appellate arguments,
22  Judge Alsup is authorized and required to make the
23  decision.  I am not.
24      Q.    But isn't, in a sense, your
25  declaration attempting to tell Judge Alsup what he

Page 99

1  ought to think about the appellate arguments?
2      A.    I don't think so.  I think my
3  declaration is an attempt to provide a perspective
4  to Judge Alsup based on what I thought in January,
5  based on the study that you summarized, as to the
6  potential of the arguments being answered on
7  appeal.
8      Q.    Let's take a look at one more quote
9  from Exhibit 12, the Highmark case, the -- on
10  Page 4, down at the bottom of the second column,
11  about -- that paragraph that starts with a
12  Head Note 5.
13      A.    We're in Highmark?
14      Q.    Yes.
15      A.    And where are you, again?
16      Q.    Page 4 --
17      A.    Page 4.
18      Q.    -- down at the bottom of the second
19  column, Head Note 5.
20      A.    Yes, I'm there.
21      Q.    Halfway through that, there's -- it
22  says, As in Pierce, as a matter of sound
23  administration of justice, the District Court is
24  better positioned to decide whether a case is
25  exceptional because it lives with the case over a

Page 100

1  prolonged period of time.
2            Do you see that?
3      A.    Yes, I see that.
4      Q.    And you agree with that sentiment,
5  don't you?
6      A.    Of course, especially compared to a
7  Court of Appeals.
8      Q.    And especially compared to the work
9  that you did in this case, which was helping
10  Mr. Fenster with his oral argument --
11      A.    Undoubt --
12      Q.    -- for two days?
13      A.    -- undoubtedly, Judge Alsup has a
14  broader and deeper knowledge of many aspects of
15  the case than I do, and, in many cases, I have no
16  knowledge of certain aspects, as we've agreed.
17            MR. DESMARAIS:  Let's take a short
18        break.
19            THE VIDEOGRAPHER:  Going off the
20        record at 12:06 p.m.
21                -  -  -
22            (Whereupon, a recess was taken from
23            12:06 p.m. to 12:25 p.m.)
24                -  -  -
25            THE VIDEOGRAPHER:  We are going

Page 101

1        back on the record at 12:25 p.m.
2                -  -  -
3      EXAMINATION BY COUNSEL FOR DEFENDANT APPLE INC.
4                -  -  -
5  BY MR. JAMES:
6      Q.    Good afternoon, Judge Michel.  I'm
7  Clay James, and I represent Apple.  I'll try not
8  to cover the same ground that we did earlier, but
9  I want to ask you a few things about a couple of
10  follow-ups on your experience.
11            Have you done any other consulting
12  or expert work for Mr. Fenster or Mr. Fenster's
13  law firm?
14      A.    I believe that a year or two ago, I
15  did a moot court for Mr. Fenster in an unrelated
16  case and, therefore, when he contacted me -- I
17  believe it was in December of 2018 -- I was
18  predisposed to accept the offered assignment
19  because I had enjoyed working with him before.  So
20  I think this was the second time I had worked with
21  Mr. Fenster.
22      Q.    Do you recall who the parties were
23  to that other case?
24      A.    I don't.
25      Q.    Do you recall how much you billed

Page 126

1   with respect to Apple, that --
2        A.   Yes --
3        Q.   Okay.
4        A.   -- I -- I looked at Cole's
5   declarations with respect to Apple as well as with
6   respect to Cisco, and to my eye, they were quite
7   in parallel.  And despite some differences in the
8   way the callee indicates its responsiveness, it
9   looked, to me, like the infringement allegations
10  as framed in the appeal applied equally to Cisco
11  and Apple products, even though those products
12  have certain differences.
13       Q.   What was your understanding of those
14  differences in -- in the way the Cisco and Apple
15  products was -- it indicates their responsiveness
16  is --
17       A.   Well, it's just what you've already
18  said, that in the case of Apple, as I understand
19  it, a device in the nature of a mobile phone,
20  smartphone, is picked up and some kind of button
21  is pushed.  And I don't know that that is the
22  exact mechanism used in the case of Cisco.  It may
23  be a little more automatic in the Cisco case.  But
24  it seems, to me, that that technical or factual
25  difference doesn't bite on the issue of

Page 127

1   infringement or no infringement.
2        Q.   Okay.
3             MR. JAMES:  I don't have anything
4        else.
5             MR. FENSTER:  Why don't we take a
6        quick break and come back?
7             THE VIDEOGRAPHER:  Going off the
8        record at 1:01 p.m.
9             - - -
10            (Whereupon, a recess was taken from
11            1:01 p.m. to 1:09 p.m.)
12            - - -
13            THE VIDEOGRAPHER:  We are going
14       back on the record at 1:09 p.m.
15            - - -
16       EXAMINATION BY COUNSEL FOR PLAINTIFF
17            - - -
18  BY MR. FENSTER:
19       Q.   Judge Michel, let's -- I'd like to
20  talk a little bit about the amount of work that
21  you did in -- prior to your declaration.
22            In your declaration, Exhibit 1, you
23  state that Over the course of approximately two
24  weeks, I studied the briefs and appendix for about
25  14 hours.

Page 128

1             Is that correct?
2        A.   Yes, that is correct.
3        Q.   Okay.
4             And then you say, On January 7th and
5   9th, I met at length with Mr. -- with Marc Fenster
6   and two colleagues.
7             Can you describe the length of those
8   meetings?
9        A.   My best recollection is that each
10  meeting lasted somewhere between five and seven
11  hours, the better part of a day.
12       Q.   Okay.  So is it fair to say that we
13  spent 10 or more hours together discussing
14  Straight Path's infringement theories and the
15  arguments to overcome summary judgment on appeal?
16            MR. DESMARAIS:  Objection:
17       leading.
18            THE WITNESS:  The total time spent
19       in the conference room at the
20       Sofitel Hotel with you and your two
21       colleagues by me was on the order of 10
22       to 15 hours.
23  BY MR. FENSTER:
24       Q.   Okay.  And what did we discuss
25  during those 10 to 15 hours?

Page 129

1        A.   Everything in the case, at
2   considerable length, and we went through all the
3   arguments and counterarguments and
4   counter-counterarguments and key documents and --
5        Q.   Did we discuss Straight Path's
6   infringement theories as to Cisco and Apple during
7   that time?
8             MR. DESMARAIS:  Objection:
9        leading.
10            THE WITNESS:  I think --
11       certainly, the foundation of the
12       summary judgment as reflected in
13       Judge Alsup's opinion was one basis of
14       assessing what the claims were, not the
15       patent claims but the infringement
16       claims, and we spent considerable time
17       assessing those infringement claims in
18       light of the admitted or declared
19       technical operation of the two accused
20       systems and otherwise focused on the
21       infringement -- infringement
22       contentions, at least as they existed
23       as of the time of Judge Alsup's order.
24  BY MR. FENSTER:
25       Q.   Based on the 10 to 15 hours that we

Page 158

1 that is -- this diagram relates to, right?
2      A.   Um-hum.  Yes.
3      Q.   Underneath that is Off hook.
4           Do you see that?
5      A.   Yes.
6      Q.   That's picking up the telephone,
7 right?  That's what "off hook" means?
8      A.   It seems like that's what it should
9 mean.
10     Q.   You don't actually know because
11 you're not an expert in SIP, right?
12     A.   I'm not an expert in SIP.
13     Q.   And -- but -- so let me tell you,
14 "off hook" means that somebody picked up the
15 telephone and is about to make a call.
16          Okay?
17          Do you -- do you follow along?
18     A.   Yes.
19     Q.   And then you see how it says, Play
20 dial tone?
21     A.   Um-hum.
22     Q.   That's how a phone works, right, you
23 pick up a phone and hear the dial tone?
24     A.   Um-hum.
25     Q.   And then they're dialing numbers.

Page 159

1          Do you see that?
2          Digit 2 --
3      A.   Um-hum.
4      Q.   -- dial tone goes away, digit 0,
5 digit 0 -- somebody is dialing 2-0-0 -- and then
6 the dial tone stops, right?  Just like a normal
7 phone, right?
8      A.   It seems so.
9      Q.   Now, underneath that, it says, Phone
10 can route call.
11          Do you see that?
12     A.   I do.
13     Q.   Now, in normal human parlance, when
14 you're speaking to your friends, when you pick up
15 the phone and hear a dial tone and you dial
16 numbers, humans refer to that as making a call or
17 placing a call, true?
18     A.   They might in a colloquial fashion,
19 sure.
20     Q.   And are you aware that
21 Straight Path's expert, Dr. Cole -- or Mr. Cole,
22 also referred to that in this case as making a
23 call?
24     A.   I am; and so did Judge Alsup.
25     Q.   Right.

Page 160

1          And you're aware, aren't you,
2 that as we're looking at the figure from the SIP
3 standard and from the Cisco product literature,
4 that also says the phone can route the call; it
5 refers to that as "caller," right?
6      A.   It does, yes.
7      Q.   Okay.  Your infringement theory,
8 however, parses that and is -- requires that not
9 to be a call, right?
10     A.   I just think it's more precise to
11 use the word "call" to refer to the direct,
12 unmediated voice communication between caller and
13 callee, and I used the word "signaling" because,
14 among other reasons, the triangular diagram at
15 Figure 1 of Judge Alsup's order labels those
16 arrows as signals.
17          So it seemed, to me, that the
18 documentation -- although there were some casual
19 uses -- loose uses of the word "call," the
20 documentation itself makes a distinction between
21 electronic signaling on the one hand and voice
22 call on the other hand.
23     Q.   Let's continue to pursue that.
24          So you have this theory called
25 "check to determine," I think your counsel

Page 161

1 referred to it, right?
2      A.   Well, it's not my theory, so I
3 wouldn't say I have a theory.  But the -- the --
4 the ruling by Judge Alsup seemed to reject the
5 idea that the claim scope was broad enough to
6 encompass either accused system, whereas my sense
7 was that a very respectable argument could be made
8 that the claims were much broader than Judge Alsup
9 had inferred, both because I don't see the
10 disclaimer that he saw and discusses at length and
11 then he has a paragraph where he says, even if the
12 oral argument didn't involve a disclaimer, then it
13 would still have the same effect, and then he
14 gives an explanation.
15          And I didn't feel that that further
16 explanation was correct because when you look at
17 the claim language, it doesn't require anything.
18          MR. DESMARAIS:  I would object to
19      that entire answer as nonresponsive.
20 BY MR. DESMARAIS:
21     Q.   Please focus on my question,
22 Judge Michel.
23     A.   All right.
24     Q.   My question was, You have a
25 check-to-determine theory that your counsel asked

Page 162

1  you about on direct just now, didn't -- don't you?
2         It's a yes-or-no question,
3  Your Honor.
4         A.   There is a theory that a call --
5  pardon me -- a check is within the claim scope --
6         Q.   And would you --
7         A.   -- I didn't make it up.  But -- but
8  I have adopted the theory.  So in that sense, I'll
9  call it my theory.
10        Q.   And the theory is, just so that we
11  understand on the record what the
12  check-to-determine theory is -- the way that
13  you've described it -- is the calling phone calls
14  the callee phone, and if someone answers the
15  phone, that check tells you that they were online
16  earlier?
17        A.   It tells you both that they're
18  online the instant they pick up and that they were
19  online earlier.
20        Q.   So let's probe that a little bit.
21        If you look at Figure 11, which I
22  think you have before you.
23        A.   I do.
24             Page 11?
25        Q.   I'm sorry.  Thank you.

Page 163

1             Page 11.
2         A.   Figure 2?
3         Q.   Figure 2, yes.
4         A.   Okay.  I'm with you.
5         Q.   Page 11 of Exhibit 9.
6             Thank you for the correction.
7             And you see where it has in the
8  right column Answer, which is around Line 17,
9  right?
10        A.   Yes.
11        Q.   Now, you're saying that that answer
12  and the "200 OK" message below it, which is 15, is
13  what the result of the check is, right?
14        A.   Yes.
15        Q.   Now, your theory, or your counsel's
16  theory, says that that "200 OK" message not only
17  is telling the caller that a human answered the
18  phone but is also telling the caller that that
19  phone was online back at the INVITE, which was
20  Number 1, around Line 9 of this chart, right?
21        A.   Yes.
22             MR. FENSTER:  Object --
23  BY MR. DESMARAIS:
24        Q.   Now --
25             MR. FENSTER:  -- objection: vague

Page 164

1             as to whether you meant -- I don't know
2  if you meant "caller" or "server."
3             MR. DESMARAIS:  The record will be
4  what the record is.
5             MR. FENSTER:  Okay.
6  BY MR. DESMARAIS:
7         Q.   So now, as a technical matter, what
8  is your basis for saying that that "200 OK"
9  message at Line 17 is telling the caller at
10  INVITE 1, at Line 9, that the callee phone was
11  online at the time of that first INVITE?
12             As a technical matter, what is your
13  basis for saying that?
14        A.   Well, I'm not sure what you mean by
15  "as a technical matter."  But just as a matter of
16  logic, if the server has an IP address for the
17  callee device in some sort of database or
18  comparable record and it then uses that IP address
19  to try to reach the callee device and if the
20  attempt is successful, it certainly proves that at
21  the time the attempt is made, the callee device is
22  online.
23             But it seems, to me, it necessarily
24  also logically has to mean that the callee device
25  was online at an earlier time, which I deduce from

Page 165

1  the fact that if it had gone off-line after the
2  registration, then the attempt to reach it
3  would've failed.
4         Q.   So you're -- you're basing that on
5  logic, not on the technical details of the Cisco
6  system, true?
7         A.   Well, I think it's both, but it's
8  primarily logic, because at levels of
9  sophistication, I'm not an expert in -- in the
10  precise operation of the Cisco system.
11        Q.   In fact, you didn't review the Cisco
12  manuals or the Cisco source code?
13        A.   I did not.
14        Q.   Right.
15             So follow with me the following
16  hypothetical:  Do you see at the top of the right,
17  there is Phone 2000 SIP?
18        A.   Yes.
19        Q.   So let's assume at time zero that
20  phone registers with the database there, before
21  any of the calling starts.
22             Okay?
23             So Phone -- Phone 2000 is registered
24  with the database as of time zero.
25             Are you with me?

Page 170

```
 1  put the "on" box just above INVITE 1.
 2       Q.  The off box.
 3       A.  I got the off box in the right
 4  place.
 5       Q.  I don't think you do.
 6           At the time INVITE 1 is issued by
 7  the caller -- at that time, Phone 2000 is
 8  off-line, according to this hypothetical.
 9       A.  Okay.
10       Q.  So then the signaling goes between
11  the caller and the server --
12       A.  Uh-huh.
13       Q.  -- and then while that signaling is
14  going back and forth, Phone 2000 comes back online
15  after INVITE 1 and the signaling but before
16  INVITE 11?
17       A.  So, like, around Line 14-1/2, or so?
18       Q.  Or -- yeah, right around there.
19       A.  Okay.  So back on then.
20           All right.
21       Q.  And right after it comes back
22  online, the server issues INVITE 11, and the phone
23  rings, and the caller picks up the phone -- or the
24  callee picks up the phone --
25           MR. FENSTER:  Objection --
```

Page 171

```
 1  BY MR. DESMARAIS:
 2       Q.  -- and "200 OK" is issued?
 3           MR. FENSTER:  -- improper
 4       hypothetical; inconsistent with the
 5       facts.
 6           THE WITNESS:  Well, the -- the --
 7       the INVITE you're referring to that's
 8       designated 11, as I understand it, is
 9       going from the server to the callee
10       device.  And then in 15, the signal
11       goes back to the server that the callee
12       device is on.  And then the server
13       sends it back to the caller device,
14       indicating the callee is on.
15           And then you had a question or a
16       deduction from that hypothetical that
17       I'm not sure I'm following.
18  BY MR. DESMARAIS:
19       Q.  Phone 2000 was not online at the
20  time of INVITE Number 1 in that scenario?
21       A.  That's true.  So in that scenario,
22  it would ostensibly not infringe.  So there is a
23  scenario in which the system would not be
24  foolproof.  So it would work in some scenarios but
25  not in every conceivable scenario, not in the
```

Page 172

```
 1  scenario that you indicated.
 2           So the claim requirement that the
 3  callee device has to have been online at the time
 4  of the query would not be met.  I agree with that
 5  in this scenario.
 6       Q.  Because the "200 OK" message is a
 7  message that says somebody picked up the phone,
 8  and that's all it says, right?
 9       A.  That's all it says.
10           And in this scenario, the deduction
11  that I made in another scenario would not obtain,
12  that's correct.
13       Q.  And there's no embodiment in
14  the patent where the embodiment is a caller
15  calling someone and the callee picking up the
16  phone is the indication that they were online at
17  the time of the call, right?
18       A.  It's not that specific.  I would
19  deduce that the Column 10, Figure 8 descriptors
20  could comprehend that, but it doesn't talk about a
21  phone being answered.  You're certainly correct
22  about that.  It just doesn't have that level of
23  specificity in it.
24       Q.  In fact, all it says in Step 70 is
25  Retrieve IP address from database if the second
```

Page 173

```
 1  unit is logged in, right?
 2       A.  Yeah.  And the -- the -- where are
 3  you now?
 4       Q.  Step 70 on Figure 8 -- excuse me --
 5  yeah, Figure 8.
 6       A.  In -- we're in Figure 8 in
 7  the patent?
 8       Q.  Yes.
 9       A.  I'm sorry.  I'm not in the right
10  place.
11           Yes -- well, in Step 70, in box --
12  in the box designated 70 --
13       Q.  My question is simply, it says,
14  Retrieve IP address from database if second unit
15  is logged in, right -- from the database?
16       A.  Yes.
17       Q.  It doesn't say "answer the
18  telephone," right?
19       A.  That's true.  I -- I agree.  It
20  doesn't say anything about telephone --
21           MR. DESMARAIS:  Okay.  No further
22       questions.
23           THE WITNESS:  -- but I would
24       suggest that it includes that because
25       it then says, If the second unit is
```

Page 182

C E R T I F I C A T E

1   DISTRICT OF COLUMBIA:

2       I, Cindy L. Sebo, a Notary Public within

3   and for the Jurisdiction aforesaid, do hereby

4   certify that the foregoing deposition was taken

5   before me, pursuant to notice, at the time and

6   place indicated; that said deponent was by me duly

7   sworn to tell the truth, the whole truth, and

8   nothing but the truth; that the testimony of said

9   deponent was correctly recorded in machine

10  shorthand by me and thereafter transcribed under

11  my supervision with computer-aided transcription;

12  that the deposition is a true record of the

13  testimony given by the witness; and that I am

14  neither of counsel nor kin to any party in said

15  action, nor interested in the outcome thereof.

16

17

18

19

20  _____

21      Cindy L. Sebo, RMR, CRR, RPR, CSR,

22          CCR, CLR, RSA, LiveDeposition

23      Authorized Reporter and Notary Public

24

25

Page 183

INSTRUCTIONS TO WITNESS

1

2       Please read your deposition over

3   carefully and make any necessary corrections.  You

4   should state the reason in the appropriate space

5   on the errata sheet for any corrections that are

6   made.

7       After doing so, please sign the

8   errata sheet and date it.

9       You are signing same subject to the

10  changes you have noted on the errata sheet, which

11  will be attached to your deposition.

12      It is imperative that you return the

13  original errata sheet to the deposing attorney

14  within thirty (30) days of receipt of the

15  deposition transcript by you.  If you fail to do

16  so, the deposition transcript may be deemed to be

17  accurate and may be used in court.

18

19

20

21

22

23

24

25

Page 184

E R R A T A

1   WITNESS:   HONORABLE PAUL R. MICHEL

2   IN RE:     STRAIGHT PATH v. CISCO, et al.

3   DATE:      August 29, 2019

4   PAGE  LINE  CHANGE

    ____  ____  _____

5
    Reason For
6   Change: _____
7   PAGE  LINE  CHANGE

    ____  ____  _____

8
    Reason For
9   Change: _____
10  PAGE  LINE  CHANGE

    ____  ____  _____

11
    Reason For
12  Change: _____
13  PAGE  LINE  CHANGE

    ____  ____  _____

14
    Reason For
15  Change: _____
16  PAGE  LINE  CHANGE

    ____  ____  _____

17
    Reason For
18  Change: _____
19  PAGE  LINE  CHANGE

    ____  ____  _____

20
    Reason For
21  Change: _____
22  PAGE  LINE  CHANGE

    ____  ____  _____

23
    Reason For
24  Change: _____
25

Page 185

ACKNOWLEDGMENT OF DEPONENT

1

2       I, _____, do

3   hereby certify that I have read the foregoing

4   pages, 1 to 181, and that the same is a correct

5   transcription of the answers given by me

6   to the questions therein propounded, except for

7   the corrections or changes in form or substance,

8   if any, noted in the attached errata sheet.

9

10

11  _____   _____

12   DATE              SIGNATURE

13

14

15

16

17

18      Subscribed and sworn to before me

19  this _____ day of_____, 20____.

20

21  My Commission expires:

22

    _____

23

24  _____

25      Notary Public