BAKER BOTTS L.L.P.
Wayne O. Stacy (SBN 314579)
wayne.stacy@bakerbotts.com
Sarah J. Guske (SBN 232467)
sarah.guske@bakerbotts.com
Jeremy J. Taylor (SBN 249075)
jeremy.taylor@bakerbotts.com
101 California Street
36th Floor, Suite 3600
San Francisco, California 94111
Telephone:      (415) 291-6200
Facsimile:      (415) 291-6300

Attorneys for Defendant
CISCO SYSTEMS, INC.

DESMARAIS LLP
John M. Desmarais (*pro hac vice*)
jdesmarais@desmaraisllp.com
Justin P.D. Wilcox (*pro hac vice*)
jwilcox@desmaraisllp.com
Jordan N. Malz (*pro hac vice*)
jmalz@desmaraisllp.com
Steven M. Balcof (*pro hac vice*)
sbalcof@desmaraisllp.com
Jennifer Przybylski
jprzybylski@desmaraisllp.com
230 Park Avenue
New York, NY  10169
Telephone:      (212) 351-3400
Facsimile:      (212) 351-3401

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STRAIGHT PATH IP GROUP, INC., | Case No. 3:16-CV-03463-WHA |
| Plaintiff, | **DEFENDANT CISCO SYSTEMS, INC.'S RESPONSE TO STRAIGHT PATH'S OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION** |
| v. | |
| CISCO SYSTEMS, INC., | |
| Defendant. | |
| | Honorable Judge William H. Alsup |
| | Hearing Date: April 23, 2020 |
| | Hearing Time: 8:00 AM |

**Pages**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ......................................................................................... 1

II.    CISCO SOUGHT FEES BASED UPON THE REAL WORLD FLAT-FEE
ARRANGEMENTS IT HAD WITH ITS COUNSEL AS PERMITTED BY LAW
AND STATUTE. ............................................................................................ 1

    A.    Cisco, Like Many Modern Companies, Paid Both Of Its Law Firms Through
Flat-Fee Arrangements. ...................................................................... 2

    B.    35 U.S.C. § 285 Requires That Courts Award *Reasonable* Attorney Fees—It
Does Not Constrain The Method By Which Litigants Request Fees Or Limit
The Evaluation Of Fee Requests To The Lodestar. ................................ 4

        1.    35 U.S.C. § 285 Predates The Proliferation Of The Billable Hour And
The Lodestar Approach By Over Two Decades. ......................... 5

        2.    The Lodestar Accounts For The Inefficiencies Of The Billable Hour–
Alternative Billing Arrangements Do Not Suffer Those Inefficiencies. .... 7

        3.    Because The Lodestar Method Is Not Required, The Special Master
Should Not Have Reduced Cisco's Fee Request On That Basis. ............... 9

III.   CISCO COMPLIED WITH THE COURT'S ORDERS AND SUPPORTED ITS FEE
REQUEST WITH EVIDENCE SHOWING THE REASONABLENESS OF ITS
FLAT-FEE ARRANGEMENTS .................................................................10

    A.    Cisco Provided The Support It Believes Complied With The Court's Order. ......10

    B.    Cisco Provided Hourly Diaries And Project Categories For Work Performed
By Baker Botts In This Litigation. .........................................................10

    C.    Cisco Provided Time Estimates And Descriptions For Work Performed By
Desmarais In This Litigation. ...............................................................13

    D.    Cisco Provided Additional Benchmarks Of Reasonableness, Which Have
Been Accepted As Evidence In This Jurisdiction. .................................14

IV.   CISCO REDUCED ITS FEES TO REQUEST FEES ONLY RELATED TO THE
CONDUCT THE COURT FOUND EXCEPTIONAL .....................................17

    A.    Cisco Reduced Its Fees To Only The Conduct The Court Found Exceptional
From The Beginning. ............................................................................17

    B.    All Of Cisco's Work Performed In This Litigation Is Tied To The Conduct
The Court Found Exceptional:  Straight Path's Decision To File Suit Despite
The Fact That It "Boxed [It]self Into A Pretty Narrow Infringement
Argument" With Its Federal Circuit Claim Constructions. ...................18

        1.    Fees Incurred Prior To June 23, 2017.....................................18

        2.    Development Of Invalidity Case And Contentions. ................19

**Pages**

3.    Claim Construction Proceedings ................................................20

4.    Depositions.....................................................................21

5.    Motions *In Limine* .....................................................22

V.    CONCLUSION ...........................................................................23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
 484 F.3d 162 (2d Cir. 2007) .................................................................6, 7, 9

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
 522 F.3d 182 (2d Cir. 2008) ........................................................................ 6

*Blum v. Stenson*,
 465 U.S. 866 (1984) .................................................................................... 8

*Brown v. Stackler*,
 612 F.2d 1057 (7th Cir. 1980) ................................................................... 8

*City of Burlington v. Dague*,
 505 U.S. 557 (1992) ................................................................................. 8, 9

*Combs v. City of Huntington, Tex.*,
 829 F.3d 388 (5th Cir. 2016) ...................................................................... 7

*Environmental Defense Fund, Inc. v. Reilly*,
 1 F.3d 1254 (D.D.C. 1993) ......................................................................... 8

*George P. Converse & Co., Inc. v. Standard Packaging Corp.*,
 No. C-644-55, 1959 WL 6880 (D.N.J. Dec. 23, 1959) ............................. 5

*Goldfarb v. Virginia State Bar*,
 421 U.S. 773 (1975) .................................................................................... 6

*Grant Paper Box Co. v. Russell Box Co.*,
 106 F. Supp. 616 (D. Mass. 1952) ............................................................. 5

*Hensley v. Eckerhart*,
 461 U.S. 424 (1983) ................................................................................. 8, 9

*Homeland Housewares, LLC v. Sorensen Research*,
 581 Fed. App'x 877 (Fed. Cir. 2014) ...................................................... 10

*Johnson v. Ga. Highway Express, Inc.*,
 488 F.2d 714 (5th Cir. 1974) .................................................................. 7, 8

*Kilopass Tech., Inc. v Sidense Corp.*,
 82 F. Supp. 3d 1154 (N.D. Cal. 2015) ...................................... 9, 14, 15, 16

*Lewis v. Kendrick*,
 944 F.2d 949 (1991) .................................................................................... 8

*Lilly v. City of New York*,
 934 F.3d 222 (2d Cir. 2019) ....................................................................... 7

*Pacific Contact Labs., Inc. v. Solex Labs., Inc.*,
 209 F.2d 529 (9th Cir. 1953) ...................................................................... 5

**Pages**

*Paeco, Inc. v. Applied Moldings, Inc.*,
  No. 71-1100, 1978 WL 21466 (E.D. Pa. Oct. 16, 1978) ................................................. 6

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*,
  478 U.S. 546 (1986)........................................................................................................ 8

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010)............................................................................................6, 7, 10

*Philadelphia Brief Case Co. v. Specialty Leather Prods. Co.*,
  160 F. Supp. 153 (D.N.J. 1958)....................................................................................... 9

*Qualcomm Inc. v. Broadcom Corp.*,
  No. 05-cv-1958-B, 2007 WL 9677112 (S.D. Cal. Oct. 29, 2007), *report and*
  *recommendation adopted by* 2007 WL 4351017 (S.D. Cal. Dec. 11, 2007) ...................16

*Samsung Electronics Co., Ltd. v. Straight Path IP Group, Inc.*,
  696 Fed. Appx. 1008 (2017) ........................................................................................... 8

*Talon, Inc. v. Union Slide Fastener, Inc.*,
  266 F.2d 731 (9th Cir. 1959)........................................................................................... 6

**Statutes**

33 U.S.C. § 1365(d) ................................................................................................................. 8

35 U.S.C. § 285 ...............................................................................................................passim

35 U.S.C. § 70 ......................................................................................................................... 5

42 U.S.C. § 1988.................................................................................................................7, 8

42 U.S.C. § 6972(e) ................................................................................................................. 8

42 U.S.C. § 7401 ..................................................................................................................... 8

## I.      INTRODUCTION

On November 20, 2019, this Court held that "Straight Path pursued an objectively baseless infringement theory against defendants by attempting to renege on explicit representations made to the Federal Circuit," finding this case exceptional.  (Dkt. No. 225 at 11.)  Following Special Master Borden's extensive review of the fees issues in this matter, Straight Path objects to those fees and argues that Cisco is not entitled to "any fee award," in an attempt to absolve Straight Path from any responsibility for its egregious actions taken in pursuing this litigation.  (*See* Dkt. No. 234 at 13.)

The Special Master already reduced Cisco's fee request based on the same arguments that Straight Path now raises.  By its objections, Straight Path simply seeks to remove all consequences for pursuing its baseless claims.  As Straight Path acknowledges throughout its objections, the Special Master already reduced Cisco's fee request by 50% due to (a) what the Special Master perceived as a failure to comply with the Court's Order (*see* Dkt. No. 232 at 17); (b) the inability to perform a lodestar analysis (*see id.* at 24-25); and (c) sending more than one attorney to certain depositions (*see id.* at 25.)  Although Cisco respectfully disagrees with certain aspects of the Special Master's findings, including the finding that Cisco failed to comply with this Court's Order, Cisco acknowledges the work performed by Special Master Borden and respectfully asks that the Court adopt the Special Master's recommended award.

## II.     CISCO SOUGHT FEES BASED UPON THE REAL WORLD FLAT-FEE ARRANGEMENTS IT HAD WITH ITS COUNSEL AS PERMITTED BY LAW AND STATUTE.

Central to the concerns that Straight Path raises are Cisco's alternative fee arrangements.  Cisco's alternative fee arrangements in this case do not present the traditional "billable hour" fees amenable to the analysis courts often take when evaluating attorneys' fees.  This is not due to Cisco or its attorneys entering into agreements that violate the rules of practice or the rules of the court— instead, this is due to a recent but rapidly growing adaptation in the market for legal services that exposes the billable hour model as flawed and favors a project-based flat-fee system as more economically rational.  Neither of Cisco's law firms in this matter—Baker Botts LLP ("Baker Botts") nor Desmarais LLP ("DLLP")—submitted hourly billing logs to Cisco.  Instead, all arrangements were negotiated between Cisco and its attorneys based upon the work to be performed at various stages of

1  the litigation, enabling predictability and surety in the fees to be paid.  (Ex.[1] A at Dec. 2019 Wilcox

2  Declaration ¶¶ 51-52.)  Although this has presented the need to assess Cisco's fees in a new way, it is

3  *not* an indication that Cisco does not legally deserve any fees, as Straight Path claims.

4      Straight Path objects to the Special Master's award on the basis that Straight Path contends the

5  lodestar is a requirement of a reasonable fee analysis.  (*See* Dkt. No. 234 at 6.)  First, although the

6  Special Master correctly found that "it may be possible to determine whether an alternative fee-

7  structure is reasonable without a lodestar analysis," the Special Master ultimately reduced Cisco's

8  award by 50% based, in part, on the difficulty in performing a lodestar analysis under Cisco's billing

9  structures.[2]  (*See* Dkt. No. 232 at 24-25.)  Straight Path's objection is therefore moot, as Cisco's fees

10  were already reduced for the reasons Straight Path argues.

11      Even so, the lodestar analysis was never a requirement in evaluating whether Cisco's fees in

12  this litigation were reasonable.  Straight Path is incorrect that "a lodestar analysis is necessary to

13  support a request for a 'reasonable attorney's fee.'"  (*See* Dkt. No. 234 at 6.)  Although the lodestar

14  has become the "touchstone" for calculating attorneys' fees in the billable hour era, it is not the sole

15  means of evaluating a fee request under 35 U.S.C. § 285 ("Section 285").  Indeed, as explained below,

16  courts awarded attorneys' fees under Section 285 long before the era of the billable hour and resulting

17  implementation of the lodestar analysis.  Prior to the lodestar, courts evaluated fee requests under

18  Section 285 based on criteria, such as benchmarking requested fees against fees negotiated by

19  sophisticated parties, data about the valuation of patent cases across the country, comparison to cases

20  involving comparable facts, and evaluation of the particular facts of the case including its complexity

21  and the work performed.  This same approach can be used—and is proper—here, where a client never

22  paid fees based on a billable hour and instead entered a reasonable negotiation with no expectation of

23  fee recovery.

### A.  Cisco, Like Many Modern Companies, Paid Both Of Its Law Firms Through Flat-Fee Arrangements.

Cisco hired Baker Botts and DLLP through monthly flat-fee arrangements, without any billable

---

[1] "Ex." refers to the exhibits attached to the Declaration of Brian Ledahl dated March 18, 2020, appearing as Dkt. Nos. 234-2 through 234-11, unless otherwise noted.
[2] Although Cisco believes the full amount of its requested fees were reasonable, Cisco accepts the Special Master's work and analysis, and does not object to the recommended reduction.

1    hour component.  (Ex. A at Dec. 2019 Wilcox Declaration ¶¶ 51-52.)  For decades, the lodestar has

2    persisted because the billable hour has been the ubiquitous fee arrangement for clients and counsel.

3    But more recently—particularly in the wake of the "Great Recession" in the late 2000s—sophisticated

4    clients, including frequent patent litigants such as Cisco, have sought alternative fee arrangements,

5    eschewing the billable hour model.  (Ex. D at Wilcox Exhibit 3 (L.M. Abramson, "Is the Billable Hour

6    Obsolete?," The Atlantic, (Oct. 15, 2015)) at 2.)  In July 2017, Microsoft announced that it "would

7    shift 90 percent of its legal work to alternative fee arrangements within two years."  (Ex. D at Wilcox

8    Exhibit 4 (S. Reisman, "Microsoft's Embrace of Alternative Fees Shows Wider Trend," LAW360

9    (Aug. 2, 2017, 9:20 PM EDT)) at 1.)  In December 2019, a GlaxoSmithKline attorney won the

10   Financial Times North American Innovative Lawyers "Legal intrapreneur of the year (In-house)"

11   award for leading "a corporate boycott of the billable hour" to "implement[] a radical policy of

12   switching outside counsel to flat fees based on both value for money and shared risk."  (Ex. D at

13   Wilcox Exhibit 5 (H. Arnold & M. Darbyshire, "FT North American Innovative Lawyers Awards

14   2019 – Winners Announced," Financial Times (Dec. 10, 2019)) at 3; Ex. D at Wilcox Exhibit 6 ("Top

15   10 'intrapreneurs': fresh faces power legal sector changes," Financial Times (Dec. 10, 2019)) at 1.)

16   Cisco, the defendant in this matter, prefers such arrangements because they provide predictability in

17   legal spending through up-front negotiations of costs that eliminate potential unpredictability that can

18   arise from hourly billing.  (Ex. D at Wilcox Exhibit 7 (Kathryn Hayes Tucker, "Cisco GC Leads

19   Charge for Fixed Rates, Patent Reform," LAW.COM (Jan. 18, 2018, 12:00 AM)); Ex. D at Wilcox

20   Exhibit 8 (R.D. Lang & L.E. Benessere, "Alternative Fee Arrangements' Challenge to the Billable

21   Hour," N.Y.L.J., 258:38 (Aug. 24, 2017)).)  Moreover, alternative fee arrangements incentivize

22   outside counsel to provide **_efficient, quality work_** rather than simply billing the most hours possible.

23        DLLP has led the way in alternative fee arrangements, eschewing the billable hour model since

24   its founding in 2010.  Now, others in the bar are responding to clients' growing preferences for

25   alternative fee arrangements.  A study by LexisNexis found that in 2017 "[t]he percentage of matters

26   that include a non-hourly billing component" was 9.2%; this number jumped by 3% in just one year

27   to 12.2% in 2018.  (Ex. D at Wilcox Exhibit 9 (CounselLink, "Enterprise Legal Management Trends

28   Report," LEXISNEXIS (Sept. 2019) at 2.)  In the patent field, the percent of cases billed through

alternative fee arrangements for 2018 is nearly 20%. (*Id.* at 8.) Some law firms have joined DLLP in moving *exclusively* to alternative fee arrangement models. For example, the firms Reichman Jorgensen and Bartlit Beck have both eschewed the billable hour in its entirety, employing only alternative fee arrangements with their clients. (*See* Ex. D at Wilcox Exhibit 10 (Reichman Jorgensen "The Firm" Webpage); Ex. D at Wilcox Exhibit 11 (Bartlit Beck LLP "Success Based Fees" Webpage).) As these firms recognized, "[a] law firm should not get paid more the longer it takes it to do the same task," yet this approach "is exactly the incentive hourly billing promotes." (Ex. D at Wilcox Exhibit 11 (Bartlit Beck Webpage).) Indeed, firms and clients have begun to recognize the benefits of alternative fee arrangements, including aligning interests to perform necessary tasks efficiently. (Ex. D at Wilcox Exhibit 12 (J.D. Glater, "Economy pinches the billable hour at law firms," THE NEW YORK TIMES (Jan. 30, 2009)) ("[T]he practice of billing for each hour worked can encourage law firms to prolong a client's problem rather than solve it.").)

**B.  35 U.S.C. § 285 Requires That Courts Award *Reasonable* Attorney Fees—It Does Not Constrain The Method By Which Litigants Request Fees Or Limit The Evaluation Of Fee Requests To The Lodestar.**

Section 285 does not constrain how litigants request attorneys' fees or the courts evaluate those requests. That statute provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." It requires only that the award be "reasonable." Nowhere does Section 285 require an attorney to bill by the hour to recover fees. Nor does it require litigants or courts to perform a lodestar analysis.

Despite its entrenchment in the legal community, nothing requires a law firm to bill by the hour or track time spent on a matter. The attorney Model Rules of Professional Conduct do not require a particular billing practice, only requiring the "reasonableness" of a fee based on the following considerations:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Model Rule of Professional Conduct 1.5: Fees (2018).  Nor is there a rule requiring lawyers to log hours or maintain billing diaries.  Nothing—except historical practice—requires a firm to log hours or bill its clients based upon 6-minute increments.

### 1. 35 U.S.C. § 285 Predates The Proliferation Of The Billable Hour And The Lodestar Approach By Over Two Decades.

Section 285 was enacted through Public Law 66-593 on July 19, 1952, incorporating a rewording of what was formerly 35 U.S.C. § 70.[3]  At that time, most law firms billed based upon minimum fee schedules or through the use of retainers and contingency fees.  (*See* Ex. D at Wilcox Exhibit 1 (F. Strong, "History & Origin of the Billable Hour," BUSINESS OF LAW BLOG (June 22, 2015)).)  District courts evaluated whether an attorney's fee in patent cases was "reasonable" based upon consideration of attorney declarations, "capacity and diligence of counsel," "professional reputation," "difficulty of the tasks presented," and counsel's performance.  *See, e.g.*, *Grant Paper Box Co. v. Russell Box Co.*, 106 F. Supp. 616, 619 (D. Mass. 1952); *George P. Converse & Co., Inc. v. Standard Packaging Corp.*, No. C-644-55, 1959 WL 6880, *1 (D.N.J. Dec. 23, 1959) (awarding fees based on "an item of $8,112.00 for services during the period January 1 to March 2, 1959").  In 1959, the Ninth Circuit affirmed in-part an award of attorneys' fees against a patentee that "misused its patents," finding the following bases by the trial court to be "clearly stated and supported by the record," and "not excessive":

> Taking into consideration the nature and complexity of the case; the length of the trial; the depositions taken; the experience, standing and eminence of counsel; the quality of skill demonstrated; the importance of the case to the plaintiff and defendant; the risk of the client and responsibility of the counsel; the time fairly and properly expended in preparation out of court; time in court; and the results accomplished, it

---

[3] 35 U.S.C. § 70 stated in relevant part:  "The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case."  *See Pacific Contact Labs., Inc. v. Solex Labs., Inc.*, 209 F.2d 529, 533 n.15 (9th Cir. 1953).

1

>    is found that the reasonable value of the services of attorneys for the
>    defendant [is] Twenty Thousand Dollars ($20,000.00).

2    *Talon, Inc. v. Union Slide Fastener, Inc.*, 266 F.2d 731, 738-741 (9th Cir. 1959).

3        The billable hour model did not become the standard fee structure in the United States until

4    the 1970s.  (Ex. D at Wilcox Exhibit 1 ("History and Origin of the Billable Hour").)  A large shift to

5    the billable hour model occurred after the Supreme Court outlawed minimum fee schedules set by

6    state bar associations in 1975.  (*Id.* (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975)).)  As

7    a result, the billable hour model became the typical fee structure by the late 1970s.  (Ex. D at Wilcox

8    Exhibit 2 (R. Muir, "A Short History of the Billable Hour and the Consequences of Its Tyranny," LAW

9    PEOPLE (June 18, 2007)).)

10        As a result of the bar's adoption of the billable hour model, courts adapted their approach to

11    evaluating attorneys' fees requests to match the format that attorneys were billing and respond to the

12    risks of attorneys over-billing time.  In 1973, the Third Circuit created the lodestar to evaluate a fees

13    request in a class action equity funds case[4]; the lodestar eventually became the prevailing approach

14    for requesting hourly fees and evaluating such requests.  *See Perdue v. Kenny A. ex rel. Winn*, 559

15    U.S. 542, 556 (2010) (noting the lodestar was adopted because of the prevailing billing practices).

16    The first use of the "lodestar" in a patent case did not occur until 1978.  *Paeco, Inc. v. Applied*

17    *Moldings, Inc.*, No. 71-1100, 1978 WL 21466, at *1-2 (E.D. Pa. Oct. 16, 1978).

18        As late as 2008, courts continued to debate the use of the lodestar versus other methods of

19    determining whether a fee is reasonable, including use of the *Johnson* factors.  *See Arbor Hill*

20    *Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 484 F.3d 162, 166-169 (2d Cir. 2007),

21    *amended on other grounds by Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,

22    522 F.3d 182 (2d Cir. 2008).  The *Johnson* factors include:

23

24

25

26

>    (1) the time and labor required; (2) the novelty and difficulty of the
>    questions; (3) the level of skill required to perform the legal service
>    properly; (4) the preclusion of employment by the attorney due to
>    acceptance of the case; (5) the attorney's customary hourly rate; (6)
>    whether the fee is fixed or contingent; (7) the time limitations imposed
>    by the client or the circumstances; (8) the amount involved in the case
>    and the results obtained; (9) the experience, reputation, and ability of
>    the attorneys; (10) the "undesirability" of the case; (11) the nature and

27

28

---

[4] *Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-168 (3d Cir. 1973).

1   length of the professional relationship with the client; and (12) awards
    in similar cases.

2   *Id*. at 166 n.1 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

3   Circuits continue to use relevant *Johnson* factors as part of their reasonable fee analyses. *See, e.g.*,

4   *Combs v. City of Huntington, Tex.*, 829 F.3d 388, 392-395 (5th Cir. 2016); *Lilly v. City of New York*,

5   934 F.3d 222, 227-233 (2d Cir. 2019).

6   In short, the law does not require either Cisco or the Court to perform a lodestar analysis for a

7   fee request under Section 285. The lodestar is not the sole manner by which litigants must request

8   attorneys' fees. Indeed, as the Supreme Court recognized in 2010, "the lodestar was adopted in part

9   because it provides a rough approximation of general billing practices." *Perdue*, 559 U.S. at 556. The

10  lodestar was never meant to be the sole test for evaluating whether a fee request is reasonable. *See id*.

11  at 556 ("[I]f hourly billing becomes unusual, an alternative to the lodestar method may have to be

12  found.").

13      **2.     The Lodestar Accounts For The Inefficiencies Of The Billable Hour–**
        **Alternative Billing Arrangements Do Not Suffer Those Inefficiencies.**

14

15  The lodestar analysis is a useful tool to evaluate fee requests in cases, such as civil rights cases

16  or class actions, where parties either lack the means to pay fees or lack the incentive to negotiate fees

17  upfront, which is precisely why the law surrounding the lodestar arose in these contexts. The Second

18  Circuit acknowledged that the lodestar is helpful where "the district court (unfortunately) bears the

19  burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes

20  to pay the least amount necessary to litigate the case effectively." *Arbor Hill*, 484 F.3d at 164. This

21  is because the lodestar arose out of cases involving fee-shifting as part of the expected attorney

22  compensation, and the key "lodestar" cases are based upon similar fee-shifting statutes. *See Lindy*,

23  487 F.2d at 167 (class action, involving post-settlement equitable funds allocation). *Perdue* focused

24  on statutory shifting of attorneys' fees in civil rights cases under 42 U.S.C. § 1988, which "mak[e] it

25  possible for persons without means to bring suit to vindicate their rights" by allowing an attorney to

26  recover his fees upon a successful civil rights claim. 559 U.S. at 559. Similarly, *Arbor Hill* involved

27  a Voting Rights Act dispute "pursuant to which fees can be recovered from the other side," giving the

28  plaintiff "little incentive to negotiate a rate structure with his attorney prior to the litigation." 484 F.3d

at 164.

Indeed, every case[5] cited by Straight Path in support of its arguments arose in the context of civil rights and environmental law fee-recovery statutes:

- *Blum v. Stenson*, 465 U.S. 886 (1984) (cited on pages 7 and 8 of Dkt. No. 234) – civil rights action reviewing fees according to 42 U.S.C. § 1988 (*id.* at 888);

- *Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980) (cited on page 6 of Dkt. No. 234) – civil rights action reviewing fees according to 42 U.S.C. § 1988 (*id.* at 1058);

- *City of Burlington v. Dague*, 505 U.S. 557 (1992) (cited on page 8 of Dkt. No. 234) – civil and environmental rights case reviewing fees according to 42 U.S.C. § 6972(e) and 33 U.S.C. § 1365(d) (*id.* at 559);

- *Environmental Defense Fund, Inc. v. Reilly*, 1 F.3d 1254 (D.C. Cir. 1993) (cited at page 6 of Dkt. No. 234) – environmental case reviewing fees according to 42 U.S.C. § 6972(e) (*id.* at 1256);

- *Hensley v. Eckerhart*, 461 U.S. 424 (1983) (cited on pages 5 and 7 of Dkt. No. 234) – civil rights case reviewing fees according to 42 U.S.C. § 1988 (*id.* at 426);

- *Lewis v. Kendrick*, 944 F.2d 949 (1991) (cited on page 5 of Dkt. No. 234) – civil rights case reviewing fees according to 42 U.S.C. § 1988 (*id.* at 951); and

- *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986) (cited on page 9 of Dkt. No. 234) – environmental case reviewing fees according to 42 U.S.C. § 7401 *et seq.* (*id.* at 548).

In other words, Straight Path did not cite a ***single case*** requiring the use of the lodestar in assessing fee awards pursuant to Section 285.

Significantly, the case that Straight Path heavily relies upon for its argument that the billable hour is a requirement for calculating fees acknowledges that it is in response to a statute under which "a prevailing plaintiff should ***ordinarily*** recover an attorney's fee unless special circumstances would render such an award unjust." *See Hensley*, 461 U.S. at 429 (quotations and citations omitted) (emphasis added). These cases address a fees analysis where the judicial system must ***entice*** counsel and provide attorneys' fees as a ***reward*** for taking a case. *See Dague*, 505 U.S. at 567-568 (Blackmun, J., dissenting) ("[I]t is a fact of the market that an attorney who is paid only when his client prevails will tend to charge a higher fee than one who is paid regardless of outcome. . . . "Congress' purpose

---

[5] Other than those listed below, the only other cases cited by Straight Path are *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) and *Samsung Electronics Co., Ltd. v. Straight Path IP Group, Inc.*, 696 Fed. Appx. 1008 (2017). *Johnson* presented an alternative approach to the lodestar analysis to determine reasonableness, as discussed above, and Straight Path discusses how the listed cases have considered *Johnson*. (Dkt. No. 234 at 7.) *Samsung* is one of the two Federal Circuit appeals that was central to the Court's exceptional case decision.

1    in adopting fee-shifting provisions [in 'civil rights laws and environmental laws'] was to strengthen

2    the enforcement of selected federal laws by ensuring that private persons seeking to enforce those laws

3    could retain competent counsel.").  This is not such a case.

4         Patent cases do not present the same risk of parties inflating attorneys' fees in anticipation of

5    an "ordinarily recover[able]" later fee award.  *See Hensley*, 461 U.S. at 429.  Section 285 instead

6    addresses a different issue—instead of acting as a reward to encourage lawyers to take a case, it serves

7    as a penalty to ***discourage*** parties prone to abuse a patent system that bring exceptional, frivolous, and

8    egregious cases against parties, forcing them to expend millions of dollars in defense of meritless

9    claims.  In this instance, Cisco did not need to agree to pay its attorneys higher rates in order to "retain

10   competent counsel" or encourage attorneys who would only be "paid regardless of outcome."  Cisco

11   was required to pay its attorneys regardless of whether it won or lost this case, and its attorneys took

12   the case with no expectation that fees would be recovered.  Cisco was required to pay its attorneys

13   regardless of the merits of the case brought against it.  Cisco—unlike plaintiffs in civil rights cases—

14   had every ability and incentive to minimize the fees it expected to pay.

15        Since the enactment of Section 285, the award of attorneys' fees in patent cases has been "the

16   exception, not the rule" to act as a punishment for bad actors, rather than an incentive for civil rights

17   attorneys.  *See Philadelphia Brief Case Co. v. Specialty Leather Prods. Co.*, 160 F. Supp. 153, 154

18   (D.N.J. 1958).  Thus, a party involved in a patent dispute is already incentivized to "pay the least

19   amount necessary to litigate the case effectively" because fees are not likely to be recovered.  *See*

20   *Arbor Hill*, 484 F.3d at 164.  The lodestar is not needed as a check against such arrangements, because

21   in this instance, the agreement was reached between sophisticated parties on even footing, and

22   "negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in

23   the market."  *See Kilopass Tech., Inc. v Sidense Corp.*, 82 F. Supp. 3d 1154, 1167 (N.D. Cal. 2015)

24   (quotations and citations omitted).

### 3.    Because The Lodestar Method Is Not Required, The Special Master Should Not Have Reduced Cisco's Fee Request On That Basis.

27        Nothing in Section 285 requires the use of the lodestar; therefore, the inability to perform a

28   lodestar analysis in this case should not be a basis to reduce fees.  As explained in detail below, Cisco

provided extensive additional evidence to support the reasonableness of its fee request in lieu of a lodestar analysis. Therefore, the lodestar should not have been a basis to reduce Cisco's award in the first instance in the Report and Recommendation, and should not be a reason to reduce the award further, as Straight Path now argues.

**III. CISCO COMPLIED WITH THE COURT'S ORDERS AND SUPPORTED ITS FEE REQUEST WITH EVIDENCE SHOWING THE REASONABLENESS OF ITS FLAT-FEE ARRANGEMENTS**

    **A.    Cisco Provided The Support It Believes Complied With The Court's Order.**

As discussed above, the Court is not required to use the lodestar to evaluate Cisco's fee request, particularly in light of the fact that Cisco did not pay for its legal defense through a billable hour fee arrangement. *See Perdue*, 559 U.S. at 556. Absent the lodestar, the Court may use other criteria to evaluate whether Cisco's fee request—based upon its monthly flat-fee arrangements with counsel— is reasonable. As the Federal Circuit has made clear, district courts retain "'considerable discretion' in determining the amount of reasonable attorney fees under § 285," including based upon their "superior understanding of the litigation." *Homeland Housewares, LLC v. Sorensen Research*, 581 F. App'x 877, 881 (Fed. Cir. 2014) (quotations omitted).

The Court's Order requested "a detailed declaration, organized by discrete projects, breaking down all attorney and paralegal time sought to be recovered." (Dkt. No. 229.) Because, unlike many other agreements between attorney and client, Cisco did not pay its attorneys based upon individual attorney or paralegal work on individual tasks, Cisco submitted its request in the format that it could provide and believed met the function of the Court's request, if not the precise exemplary form provided. On December 5, 2019, Cisco submitted declarations by Justin Wilcox (Ex. A) and Wayne Stacy (Ex. B)—partners at DLLP and Baker Botts, respectively—detailing the work performed during each of the months that Cisco paid a flat-fee. These fee arrangements, as shown in the declarations, escalated based on the work expected to be performed at the various stages of the case. (*See, e.g.*, Ex. A at Wilcox Declaration ¶ 55.)

    **B.    Cisco Provided Hourly Diaries And Project Categories For Work Performed By Baker Botts In This Litigation.**

At the Special Master's request, however, Cisco supplemented its evidentiary submission to

include diary entries for the Baker Botts attorneys involved in the litigation.  (*See* Ex. G (Supplemental Wilcox Declaration and Exhibits); Ex. H (Guske Declaration and Exhibit); Ex. I (Bernstein Declaration).)  Although Cisco did not use these diaries to determine how much it would pay Baker Botts each month, Cisco provided these diaries in the format requested by the Court.  It appears, however, that in his evaluation the Special Master may have misunderstood the submission, and seems to have overlooked the data submitted.

Throughout the Special Master's Report and Recommendation, he regularly cites to and comments on entries included in "Guske Decl., Ex. 1."  (*See, e.g.*, Dkt. No. 232 at 18-22.)  However, as explained in the Supplemental Wilcox Declaration, Guske Ex. 1 does ***not*** reflect the narrowed diary entries, sorted categories, and extensive calculations that Cisco presented to meet the Special Master's request to provide additional evidence more tailored to the Court's Order.  (*See* Ex. G at Supplemental Wilcox Decl. ¶ 77 ("[W]e have made efforts to eliminate entries and therefore Exhibit 16 does not contain all entries that appear in Guske Exhibit 1.").)  The Guske Declaration and Exhibit 1 (submitted to this Court as Ex. H) were only intended to identify and authenticate the raw diary entries from Baker Botts as they were sent to DLLP to prepare for the submission to the Special Master.

Instead, as explained in the Supplemental Wilcox Declaration, these Baker Botts entries were extensively narrowed, categorized, and sorted to provide "discrete projects" with a "detailed description of the work, giving the date, hours expended, attorney name, and task for each work entry, in chronological order."  (Dkt. No. 226 at 2; Ex. G at Supplemental Wilcox Decl. ¶ 81 ("To provide a project-based fee assessment, we removed entries from certain categories to tailor the estimate to those tasks that were necessary to the litigation based upon the narratives provided.").)  Wilcox Exhibit 16, a native Excel version of this breakdown (Wilcox District Court Decl.[6] ¶ 4), and Wilcox Exhibit 17, a PDF version of this breakdown, provide precisely the information requested to compare to the flat-fee arrangements.  (Wilcox Exs. 16 and 17 are included in Ex. G to this Court.)

Wilcox Exhibit 16 provides each of these categories of work performed, and lists out, in order, for every diary entry:

- **Project Category** (not included in Guske Ex. 1) – an identification of the project a

---

[6] "Wilcox District Court Decl." refers to the Declaration of Justin P.D. Wilcox in support of this Response, concurrently filed.

particular diary entry was sorted under.  Because certain diary entries described more than one category, these diary entries were duplicated to appear within each category, and then the time spent adjusted accordingly.  (*See* Ex. G at Supplemental Wilcox Decl. ¶¶ 78 (describing categorization process), 81 (describing narrowing of categories));

- **Date** (from entry in Guske Ex. 1) – the date associated with a particular diary entry;

- **Timekeeper** (from entry in Guske Ex. 1) – the timekeeper that entered a particular diary entry;

- **Index** (from entry in Guske Ex 1) – a code that helps match up entries between Guske Ex. 1 and Wilcox Ex. 16;

- **Diaried Hours** (from entry in Guske Ex. 1) – the hours identified in the diary entry;

- **Project Hours** (not included in Guske Ex. 1) – as explained in the Supplemental Wilcox Declaration, this is a reduction that was made to diary entries to account for entries that included more than one project.  In this way, many of the diary entries were reduced to eliminate projects, such as appellate work on the IPR proceedings.  (*See* Ex. G at Supplemental Wilcox Decl. ¶¶ 78 (describing reduction of "Diaried Hours" to "Project Hours"), 80 (describing use of "Project Hours" to estimate "Billed Amount"), 82 (describing instances where "Project Hours" were used when categories were eliminated));

- **Hourly Rate** (not included in Guske Ex. 1) – billing rates based upon the Guske Declaration.  (*See* Ex. G at Supplemental Wilcox Decl. ¶¶ 79-80 (describing insertion of "Hourly Rate"));

- **Billed Amount** (not included in Guske Ex. 1) – calculations based upon the reduced time work from the project hours column and the hourly rate; (*See* Ex. G at Supplemental Wilcox Decl. ¶ 80 (describing calculation of "Billed Amount")); and

- **Narrative** (from entry in Guske Ex. 1) – the written narratives for work performed. Because these were not altered to maintain authenticity, certain work may be described in a particular narrative, even if it was later eliminated, as explained in the Supplemental Wilcox Declaration.  (*See* Ex. G at Supplemental Wilcox Decl. ¶¶ 78, 80-82 (explaining that "Narrative" column descriptions were not edited in order to preserve integrity of Baker Botts time entries, but not all described tasks and corresponding time were included in calculations).)

The Special Master raised concerns about certain entries, such as those describing work on appellate strategy.  (Dkt. No. 232 at 20-21).  However, as was clarified in the Supplemental Wilcox Declaration, these entries, as well as many other categories of entries that originally appeared in Guske Ex. 1, were ***not*** included in the time calculations.  (Ex. G at Supplemental Wilcox Declaration ¶ 81 (identifying categories of work that were eliminated, including removing "[t]ime spent assistant appellate counsel on the co-pending IPR appeal").)  The reason certain descriptions related to appellate work appeared was because other, relevant work was performed in the same diary entry.  As explained in the Supplemental Wilcox Declaration, "[b]ecause certain entries in the 'Narrative' column described more than one project, narratives referencing work performed for the [excluded] tasks still appear in Exhibit 16 where another task described in the same narrative falls within a 'Project

Category' that is included in Exhibit 16.  However, ***the project hours are accordingly reduced***." (*Id.* ¶ 82 (emphasis added).)  For example, below is the first entry that the Special Master identified on page 20 of his Report and Recommendation (Dkt. No. 232 at 20); the entry also included work performed on answering Straight Path's complaint.  Because only part of the work performed was related to the fees motion, the "Project Hours," and subsequently the "Billed Amount" entries were accordingly reduced by half in the calculations presented in Exhibit 16 as shown by comparing the "Diaried Hours" column (value of 3.2) with the "Project Hours" column (value of 1.6):

| Project Category | Date | Timekeeper | Index | Diaried Hours | Project Hours | Hourly Rate | Billed Amount | Narrative |
|---|---|---|---|---|---|---|---|---|
| *Answer to Complaint | 08/04/16 | GUSKE, SARAH JOANN | 26647227 | 3.2 | 1.600 | $800.00 | 1280.00 | Joint defense call re extending time to file appellate briefs; discuss appeal strategy with joint defense group; discuss complaint answer with Jeremy Taylor and Wayne Stacy. |

This process is extensively explained in the Supplemental Wilcox Declaration at ¶¶ 75-90.  (Ex. G.)

Cisco provided the Baker Botts entries in a native Excel format in order to "provide[] the Special Master with the information and tools to adjust (if necessary) the fee request based on his assessment of the types of projects and level of staffing," in a way that allowed for automatic recalculations.  (Ex. G at Supplemental Wilcox Decl. ¶¶ 84-90; Wilcox District Court Decl. ¶ 4.)  Cisco believed this was the most efficient way to help Straight Path and the Special Master perform their review while providing the precise information requested in the Court's Order in a way that could easily be adjusted and recalculated.  (Wilcox District Court Decl. ¶ 4.)  Many of the concerns the Special Master raised were addressed in the body of the February 18, 2020 Supplemental Declaration of Justin P.D. Wilcox, which the Special Master did not cite in his Report and Recommendation and appears to have overlooked.  Cisco provided the detail ordered by the Court and requested by the Special Master.  Thus, Cisco's fee request should not have been reduced for this reason either, and should not be further reduced as Straight Path now argues.

**C.    Cisco Provided Time Estimates And Descriptions For Work Performed By Desmarais In This Litigation.**

With respect to the fees Cisco paid to DLLP, Cisco respectfully disagrees with the Special Master's decision to "not consider[]" Wilcox Exhibits 13-15 and the Declaration of Chuck Bernstein.  (Dkt. No. 232 at 19.)  As explained throughout the various filings associated with Cisco's request for fees, DLLP has never required its attorneys to maintain hourly time diaries, except for pro bono matters.  (*See, e.g.*, Ex. A at Wilcox Decl. ¶ 46; Ex. G at Supplemental Wilcox Decl. ¶ 51.)  This

approach is in line with the way DLLP bills its clients, and provides a more streamlined, less cumbersome way for its attorneys to perform their work by focusing on the work, rather than logging hours, and eliminates the burden on clients to review time diaries and negotiate fees after the fact. Cisco reiterates that neither the professional rules of conduct nor case law requires that an attorney maintain hours.  (*See supra*, Section II.B.)  In cases such as these—where fees are the exception, not the "ordinarily recoverable" rule—neither the client nor the law firm should be required to alter its practice in a way that is not required by law in order for the client to recover fees where the ***opposing side*** was the bad actor.  Alternative ways exist to determine the reasonableness of fees:  the negotiation between sophisticated parties, the cost of the attorneys' time working on the matter, comparison to similar cases, review of the time and labor required, the difficulty of the case at hand, the experience and reputation of the attorneys, and the nature of the relationship with the client.  All of these other factors have been presented, and Cisco's inability to provide a traditional billable hour review of DLLP's work in this case should not preclude Cisco from recovering fees it negotiated in good faith, actually paid to its attorneys, and that it is otherwise entitled to recover in this proceeding.

### D.   Cisco Provided Additional Benchmarks Of Reasonableness, Which Have Been Accepted As Evidence In This Jurisdiction.

Beyond the information provided by each of its law firms, Cisco provided extensive additional support for the reasonableness of its fees.  At the outset, the fact that sophisticated parties—Cisco and its two law firms—negotiated a monthly flat-fee is on its own evidence of the fee's reasonableness. *See Kilopass*, 82 F. Supp. 3d at 1167 ("Negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market.").  In addition, the Court may also evaluate Cisco's alternative fee agreements by, among other things, the *Johnson* factors applicable to Cisco's fee request:

**(1) The time and labor required.**  The declarations of Justin Wilcox (Ex. A at Wilcox Decl. ¶¶ 15-27, 44-48; Ex. G at Supp. Wilcox Decl. ¶¶ 20-32, 39-55; Ex. G at Wilcox Exhibit 13) and Wayne Stacy (Ex. B at Stacy Decl. ¶¶ 5-18) described the work performed by each attorney and the key case milestones reached for each month of fees sought, highlighting the extensive work performed.

 **(2) The novelty and difficulty of the questions, and (3) the level of skill required to**

1    **perform the legal service properly.**  This case involved four patents related to computer networking

2    and required the attorneys on the case to learn both the technology of the patents as well as

3    understanding prior litigations and arguments regarding claim scope before the U.S. Patent and

4    Trademark Office and the Federal Circuit.  (Ex. G at Supp. Wilcox Decl. ¶¶ 20-32.)

5         **(6) Whether the fee is fixed or contingent.**  The fee in this case was a monthly fixed fee

6    arrangement.  (Dkt. No. 210-4 (Wall Decl.)[7] ¶¶ 9, 12.)  In addition, Cisco awarded DLLP a contingent

7    "success bonus" upon Cisco's win of summary judgment of non-infringement, which Cisco did ***not***

8    seek to recover through the fees request.  (*Id.* ¶ 14.)

9         **(8) The amount involved in the case and the results obtained.**  This litigation was potentially

10   valued at $123 million based upon potential treble damages for willful infringement.  (Ex. A at Wilcox

11   Decl. ¶ 57; Ex. G at Supp. Wilcox Decl. ¶ 91.)

12        **(9) The experience, reputation, and ability of the attorneys**.  The Declarations of Justin

13   Wilcox (Ex. A at Wilcox Decl. ¶¶ 28-43 and Wilcox Exhibits 1 and 2; Ex. G at Supp. Wilcox Decl.

14   ¶¶ 39-48) and Wayne Stacy (Ex. B at Stacy Decl. ¶¶ 4-14 and Stacy Exhibits 1 and 2) describe the

15   backgrounds of each attorney and the respective law firms, highlighting the achievements of both.

16        **(11) The nature and length of the professional relationship with the client**.  Since its

17   founding in 2010, DLLP has represented Cisco in multiple patent litigations in different judicial

18   districts, such as this District, the Eastern District of Texas, and the District of Massachusetts.  For

19   each such litigation, Cisco has engaged DLLP through an alternative fee arrangement—not a billable

20   hour arrangement.  (Ex. D at Wilcox Decl. ¶ 2.)

21        **(12) Awards in similar cases.**  Based upon the facts of the case, Cisco's request for fees is

22   well below what has been deemed reasonable by other courts, including courts within this District.

23   (*See, e.g.*, Ex. A at Wilcox Decl. ¶¶ 57-63.)  For example, in *Kilopass*, a patent litigation that similarly

24   resolved on summary judgment, the court awarded ***$5,315,315.01 in fees alone***.  82 F. Supp. 3d at

25   1173.  Cisco requested less than 75% of that amount in this case that is very similar in scope and

26   procedural posture to *Kilopass*:

27

28   _____
[7] The Declaration of Laurie Wall was previously filed in this matter on June 17, 2019.  An identical
copy of the Wall Declaration was provided to the Special Master on December 5, 2019.

|  | Straight Path v. Cisco | Kilopass v. Sidense |
|---|---|---|
| Jurisdiction | Northern District of California | Northern District of California |
| Number of Patents | 4 | 3 (82 F. Supp. 3d at 1159) |
| Technology | Computer networking | Semiconductors (*id*. at 1159–1160) |
| Financial Stake | $123 Million | $60 Million (*id*. at 1173 n.14) |
| Reason for "irreconcilable" infringement position | Claim construction and IPR proceedings narrowed claims | Claim construction and IPR proceedings narrowed claims (*id*. at 1160-1161) |
| Disposition of case in district court | Grant of summary judgment of noninfringement | Grant of summary judgment of noninfringement (*id*. at 1161–1162) |
| Outcome of appeal | Summary affirmance | Summary affirmance (*id*. at 1163) |

Similarly, in *Qualcomm Inc. v. Broadcom Corp*., the district court awarded $6,753,749.60 in attorneys' fees in a patent litigation case that proceeded through trial.  No. 05-cv-1958-B, 2007 WL 9677112, *9 (S.D. Cal. Oct. 29, 2007), *report and recommendation adopted by* 2007 WL 4351017 (S.D. Cal. Dec. 11, 2007).  Cisco sought less than 60% of the fees awarded in *Qualcomm* despite the fact that this case resolved on summary judgment less than a month before trial was scheduled to begin.

Cisco's request was also well within range of the fees and costs identified by the AIPLA 2017 Report of the Economic Survey (hereafter "AIPLA").[8]  (Ex. A at Wilcox Exhibit 12.)  The AIPLA survey instructed respondents "to estimate [total litigation costs] based on a single IP asset, such as one patent at issue."  (Ex. A at Wilcox Exhibit 12 at 3.)  For the purposes of surveying the cost of litigation, the AIPLA breaks down its data by (1) the value of the litigation, and (2) the stage of the litigation, considering factors such as location of the case.  The present case falls in the ">$25M" category and between two of the AIPLA's stage of the litigation categories—"Discovery, Motions, and Claim Construction," and "Pre-Trial, Post-Trial, and Appeal."  The following is a summary of the relevant AIPLA statistics:

| AIPLA Category | Mean | Third Quartile |
|---|---|---|
| Litigation-Patent Infringement, All Varieties >$25M Inclusive of discovery, motions, and claim construction in San Francisco | $2.325M | $4.750M |
| Litigation-Patent Infringement, All Varieties >$25M Inclusive of pre-trial, trial, post-trial, and appeal in San Francisco | $4.250M | $7.500M |

These statistics do not take into account the number of asserted patents or the technology involved.  Cisco's request falls well within the amounts surveyed by the AIPLA in the San Francisco area.  This

---

[8] Although the AIPLA's Estimated Litigation Costs take into account both fees and costs, including "legal and paralegal services, local counsel, associates, paralegals, travel and living expenses, fees and costs for court reporters, photocopies, courier services, exhibit preparation, analytical testing, expert witnesses, translators, surveys, jury advisors, and similar expenses," it is instructive on estimating the costs of litigation.  (Ex. A at Wilcox Exhibit 12 (AIPLA) at 3.)

1   demonstrates that Cisco's request was reasonable especially given (a) that this case was valued nearly

2   $100 million more than the lowest valued cases surveyed in the AIPLA categories, and (b) the number

3   of patents and the technology involved in this case.

4          In sum, Cisco provided more than sufficient means to test whether Cisco's fee request was

5   reasonable, even without the use of the lodestar and the billable hour structure.  Based upon all the

6   available real-world, marketplace benchmarks, Cisco's fee request was below market and should not

7   have been reduced by the Special Master, and should not be reduced even further as Straight Path

8   argues.

9   **IV.    CISCO REDUCED ITS FEES TO REQUEST FEES ONLY RELATED TO THE
         CONDUCT THE COURT FOUND EXCEPTIONAL**

10

11         **A.    Cisco Reduced Its Fees To Only The Conduct The Court Found Exceptional
                 From The Beginning.**

12         From the outset of the application for fees, Cisco reduced its fees to eliminate any not tied to

13  the necessary work performed in defending this litigation.  For example, from the beginning, Cisco

14  eliminated fees for any overlapping work provided by its transition between two law firms, eliminated

15  the success bonus paid to DLLP following the Court's grant of summary judgment of non-

16  infringement, and eliminated any fees incurred after the Court's grant of summary judgment.  Cisco's

17  case never involved patents other than those subject to the Court's summary judgment order, such as

18  the '208 Patent at issue in the Apple proceeding; therefore, all of Cisco's work on this case was to

19  defend against an action that should never have been brought in the first place.[9]  And although Cisco's

20  fees were not based upon any specific tasks performed or hours logged, when Cisco provided the

21  breakdown of Baker Botts diary entries Cisco eliminated all work performed on:  case management,

22  general litigation strategy, preliminary investigations, expert retention, unsuccessful motions, IPR

23  appeal proceedings, mediation, and privilege review.  (Ex. G at Supp. Wilcox Decl. ¶ 81.)  Even after

24  performing this reduction to the Baker Botts diary estimates, the breakdown of the Baker Botts diary

25  entries still resulted in an estimated fee nearly $600,000 ***over*** those actually paid and sought by Cisco.

26

27  [9] The Court, in noting that the Special Master should identify items that "bear[] little or no relation to
    the conduct found exceptional herein" did not call out work performed by Cisco to defend against

28  Straight Path's claims.  (Dkt. 226 at 4.)  Instead, the Court only called out conduct related to the '208
    patent—a patent that was never involved in the Cisco matter.

(Ex. G at Supp. Wilcox Decl. ¶ 89.)  Therefore, even before the Special Master's 50% reduction, Cisco already sought narrowed, reduced attorneys' fees from the outset.

**B.**   **All Of Cisco's Work Performed In This Litigation Is Tied To The Conduct The Court Found Exceptional:  Straight Path's Decision To File Suit Despite The Fact That It "Boxed [It]self Into A Pretty Narrow Infringement Argument" With Its Federal Circuit Claim Constructions.**

**1.**   **Fees Incurred Prior To June 23, 2017**

Contrary to Straight Path's representation in its objection, the "basis for the Court's finding of exceptionality" did *not* "hinge[] on [the *Samsung*] decision."  (*See* Dkt. No. 234 at 9.)  As Straight Path noted, the *Samsung* decision was the *second* Federal Circuit decision related to this issue.  What Straight Path fails to note, however, is that the claim construction at issue—the "is connected" limitation—was decided in the *Sipnet* appeal in *2015*—a year before Straight Path filed this suit. During the *Samsung* appeal, attorneys for Straight Path simply "*reiterated* Straight Path's position that 'our system also has to *track whether you are continuing to stay on line*.'"  (Dkt. No. 172 at 8 (bold-italics emphasis added; italics in original).)  As the Court noted in its order granting fees, the decision "crucial to the instant motions" arose *before Straight Path filed the case:*

> For the next two years [2015 and 2016] (*and before Straight Path filed the instant actions*), *inter partes* review of the '704, '121, and '469 patents ensued before the Patent Trial and Appeal Board and the United States Court of Appeals for the Federal Circuit.  *Crucial to the instant motions*—and the prior order granting summary judgment of noninfringement for both defendants—*those proceedings focused on the 'is connected' limitation*, as found in representative Claim 1 of the '704 patent . . . .

(Dkt. No. 225 at 2-3 (emphasis added).)  The *Samsung* decision served only to *reaffirm* Straight Path's position regarding the meaning and scope of the claims.  (*See id*. at 4-5.)

Moreover, Straight Path's suggestion that this case was not exceptional until after the *Samsung* decision is incorrect.  Straight Path mischaracterizes the statements made to the Special Master on March 3, 2020.  Mr. Wilcox did not represent to the Special Master that "Cisco did not think it had a strong exceptional case claim before" the Court's Order to Show Cause.  (Dkt. No. 234-1 (Ledahl Decl.) ¶ 14.)  Mr. Wilcox informed the Special Master that, because fees are not assumed in cases such as these, Cisco did not perform any legal analysis into whether it could recover fees and therefore did not prematurely alter its business practices for keeping time or logging work.  Instead, Cisco focused

1   on defending the litigation, and upon recognizing Straight Path was not able to provide any viable
2   infringement theory following the close of discovery, moved for summary judgment of non-
3   infringement and began investigating its entitlement to fees after that time.  (Wilcox District Court
4   Decl. ¶ 5.)  Therefore, Cisco should be awarded the fees that it has incurred since the beginning of this
5   case, and not be limited, as Straight Path suggests, to fees incurred after the Federal Circuit's *Samsung*
6   decision.

### 2.        Development Of Invalidity Case And Contentions.

8       But for Straight Path bringing an unreasonable, exceptional case against Cisco, Cisco would
9   not have needed to pursue the task of defending against the allegations.  No reasonable attorney,
10  representing a defendant in a patent suit, would risk foregoing an invalidity case even if the
11  infringement case was clearly baseless.  Until the opportunity for the Court to acknowledge the
12  baselessness of the case at summary judgment, Cisco had to pursue every avenue available to defend
13  itself, including through presenting an invalidity case.

14      Moreover, the Court explicitly considered Cisco's invalidity case to be linked to the "is
15  connected" limitation—as did Straight Path.  In its letter to the Court requesting permission to file a
16  motion for summary judgment, Straight Path requested to file a validity motion regarding the "is
17  connected" limitation, noting that its motion related to "the same construction previously given by the
18  Federal Circuit" in the *Sipnet* matter.  (Dkt. 120 at 1-2.)  In response, the Court allowed both parties
19  to "cross-move for summary judgment on the sole issue of the 'is connected' claim limitation."  (Dkt.
20  No. 123.)  The "is connected" limitation has always been intertwined with both non-infringement and
21  invalidity—the *Sipnet* and *Samsung* appeals having both arisen out of ***invalidity*** disputes—and
22  remained intertwined up through summary judgment.   The Court's order granting fees also
23  acknowledged that these issues remained intertwined up through determining the reasonableness of
24  Straight Path's decision to pursue this case.  The Court determined it could not credit Judge Michel's
25  opinion on the issue of reasonability because Judge Michel did not consider the invalidity case, finding
26  that his focus

27          remained on the appeal of the summary judgment order and, specifically, whether
28          Straight Path's "track or check" infringement theory could technically fit within the
            Federal Circuit's claim construction.  But Straight Path did not hatch the new theory

supporting its incredibly broad reading in a vacuum.  Insofar as Judge Michel may have understood (after the fact) Straight Path's infringement theory to be reasonable within the four corners of the claim construction, *he did not (and was not hired to) consider how the theory impacted the patents' facial invalidity* (*e.g.*, *id.*, Dkt. No. 241-2 at 112-14).  Yet the summary judgment order expressly considered this issue in rejecting Straight Path's theory[.]

Dkt. No. 225 at 11 (emphasis in original).

Finally, Cisco's greater expenditure on the invalidity case than the non-infringement case is entirely reasonable.  Cisco bore the burden of proof on invalidity, including needing to prove that each and every limitation of each patent claim that Straight Path asserted, and was obligated to provide time-consuming invalidity contentions for each claim.  Therefore, it was reasonable for Cisco to focus a significant portion of its work on its invalidity defense, particularly at the early stages of the litigation.  By contrast, non-infringement is not a defense for which Cisco bears the burden of proof, and an accused infringer can select a small number of limitations on which to defend and need not defend on every limitation of the patent claims.  In this case, Cisco focused its non-infringement defense on the "is connected" limitation common to each asserted claim of the four patents-in-suit.  As a result, the fact that Cisco's attorneys logged fewer hours on its focused non-infringement defense than its invalidity defenses, which involved significant research on prior art systems and depositions, is entirely reasonable.

Therefore, Cisco properly expended time preparing its invalidity case to defend against Straight Path's claims, and work on the invalidity case should not be used to reduce the flat fee award requested.

### 3.    Claim Construction Proceedings

As explained above, Cisco would not have been obligated to undertake claim construction proceedings but for Straight Path's filing of this matter in the first instance.  The "is connected" limitation was only one of twenty-two phrases that the parties submitted with their Local Patent Rule 4-3 Joint Claim Construction Chart and Prehearing Statement as either having an agreed construction or a disputed construction.  (Dkt. No. 32.)  Cisco could not simply accept Straight Path's position on all other claim constructions because of Cisco's belief that the litigation was unreasonable in light of the "is connected" limitation.  As explained above, Cisco was required to defend against Straight

1   Path's claims until it could reach the close of discovery and explain the unreasonableness of Straight

2   Path's positions in a summary judgment motion.  Therefore, the time spent participating in the claim

3   construction process should not be used to reduce the flat fee award requested.

### 4.   Depositions

5       It is unclear why Straight Path asserts this objection, as the Special Master already factored a

6   reduction due to depositions in his Report.  (*See* Dkt. No. 232 at 25 ("Plaintiff also argues that Cisco

7   overlawyered its depositions by sending two attorneys when Plaintiff only provided one. . . . This is

8   further evidence that the flat rate paid by Cisco may have been more than what was reasonably

9   necessary to litigate the case.").  However, because Cisco does believe that sending two attorneys in

10  limited circumstances was in fact reasonable, Cisco addresses Straight Path's objection below.

11      First, Cisco notes that the depositions all related to defending against this lawsuit which should

12  not have been brought against Cisco at the first instance.  As explained above, the Court recognized

13  that the invalidity case was inseparably intertwined as they related to the "is connected" limitation that

14  is the root of this dispute.  All the depositions taken related to the patents-in-suit and defending against

15  claims related to those patents.  That certain work was expended on depositions that did not ultimately

16  occur is not a reason to exclude such work—preparation for those depositions was still a direct result

17  of litigating this case.

18      Second, that Baker Botts and Desmarais sent more than one attorney to certain depositions is

19  not dispositive of whether the flat fee agreements were reasonable.  The identifications of attorneys

20  participating in depositions provides a description of the work performed by attorneys within a given

21  month as a check of reasonableness of the flat fee arrangements rather than individually reflecting fees

22  paid by Cisco.  Moreover, the Court's order stated that "[o]rdinarily, no more than one attorney and

23  one paralegal need be present at a deposition;" the Court did not specifically limit parties to no more

24  than one attorney per deposition.  (Dkt. No. 226.)  In no circumstance is Cisco seeking fees for a

25  paralegal present; rather, for particularly important depositions, an additional attorney acted as the

26  second set of hands where doing so served to further aid the case.

27      This is precisely one benefit of the flat-fee arrangement over the billable hour structure.  Baker

28  Botts and DLLP could focus on what the most efficient allocation of attorney time was based on the

1   importance of particular depositions and in their impact on the case without affecting the amount billed

2   to the client.  As a result, while only one Cisco attorney attended many depositions in this case, certain

3   other depositions warranted multiple attorneys.  For instance, the Cole deposition, Wagner deposition,

4   and Dell deposition were expert depositions requiring significant work, research, documents, and

5   assistance to ensure all issues were addressed and all materials available within the limited deposition

6   time.  In addition, summary judgment motions were due within ***days*** of the expert depositions taking

7   place—by having additional attorneys present at the depositions able to take notes in real time, rather

8   than waiting for transcripts, the attorneys could expedite work on motions citing to those depositions.

9   Similarly, for both expert depositions and important fact witness depositions (such as Dan Lang,

10  Cisco's Vice President of Intellectual Property and Deputy General Counsel), the presence of

11  additional attorneys allowed for additional assistance.  Such attendance is rarely a waste of time for

12  such attorneys, as during the deposition they are learning and developing more of their positions for

13  the case.  By having additional attorneys at key depositions, this ultimately ***reduced*** the work

14  performed on the case as a whole.

15      Therefore, even putting aside the fact that the Special Master already reduced Cisco's fees to

16  account for sending more than one attorney to certain depositions, the fee award should not be further

17  reduced as these decisions were made to reduce the burden on the client, rather than create overbilling

18  that warrants reduction in the fee award.

19                    **5.      Motions *In Limine***

20      Cisco needed to defend against this litigation and prepare for trial up until the time the Court

21  ruled on its summary judgment motion.  The Court required that the parties provide, on September 12,

22  2017, an identification of "their top 10 motions *in limine*."  (*See* Dkt. Nos. 89, 113, 115.)  In order to

23  provide the Court with a proper identification, Cisco's attorneys needed to perform work on and

24  research into these motions.  After providing this identification and receiving word from the Court that

25  it could file six motions *in limine*, Cisco continued to prepare for an imminent trial as it awaited its

26  opportunity to argue the motion for summary judgment of non-infringement—as Cisco expects

27  Straight Path similarly prepared for trial during that time period.  These motions *in limine* were due to

28  the Court the same day as the hearing on the summary judgment motions, November 9, 2017.  It was

1   not until November 7, 2017, that the Court vacated the pretrial conference and continued the matter to

2   February 28, 2018, before ultimately granting summary judgment and resolving the case.  Therefore,

3   Cisco was required to continue working on defending this litigation and prepare for trial up until that

4   time, and this work performed in anticipation of trial should not be used to reduce Cisco's flat fee

5   request.

6   **V.      CONCLUSION**

7         Straight Path's objections—which were largely already addressed by the Special Master's 50%

8   fee reduction—should be denied.  Cisco's decision to pursue a more efficient billing model should not

9   be used against it to allow Straight Path to avoid paying fees after bringing a meritless lawsuit against

10  Cisco.  This is especially true here for the reasons detailed herein, because the Special Master's 50%

11  fee reduction has already reduced Cisco's fees too far.  Although Cisco respectfully disagrees with

12  certain aspects of the Special Master's findings, Cisco acknowledges the work performed by the

13  Special Master and respectfully asks this Court to adopt his recommended award.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     Dated:  March 25, 2020

2

                                       Respectfully submitted,

3                                        _____

                                       BAKER BOTTS LLP

4                                        Sarah J. Guske (SBN 232467)

                                       sarah.guske@bakerbotts.com

5                                        Jeremy J. Taylor (SBN 249075)

                                       jeremy.taylor@bakerbotts.com

6                                        Wayne O. Stacy (*pro hac vice*)

7                                        wayne.stacy@bakerbotts.com

8                                        DESMARAIS LLP

                                       John M. Desmarais (*pro hac vice*)

9                                        jdesmarais@desmaraisllp.com

                                       Justin P.D. Wilcox (*pro hac vice*)

10                                     jwilcox@desmaraisllp.com

                                       Jordan N. Malz (*pro hac vice*)

11                                     jmalz@desmaraisllp.com

                                       Steven M. Balcof (*pro hac vice*)

12                                     sbalcof@desmaraisllp.com

                                       Jennifer Przybylski (*pro hac vice*)

13                                     jprzybylski@desmaraisllp.com

14

15                                     By:*/s/ Justin P.D. Wilcox*

16

17                                     **Attorneys for Defendant**

18                                     Cisco Systems, Inc.

19

20

21

22                                 **CERTIFICATE OF SERVICE**

         I hereby certify that on March 25, 2020, I electronically filed the foregoing Response to

23 Straight Path's Objections to the Special Master's Report and Recommendation using the Court's

24 ECF system which will electronically serve the same upon all counsel of record.

25

26                                */s/ Justin P.D. Wilcox*

27                                Justin P.D. Wilcox

28